615 F.2d 334
 5 Fed. R. Evid. Serv. 1137
 Ernest J. RAMOS et al., Plaintiffs, Cross-Claimants and
Intervenors-Appellants,
v.
LIBERTY MUTUAL INSURANCE COMPANY et al., Defendants,
Shell Oil Company et al., Defendants-Appellees.
HAROLD LEE ENGINEERING CO. et al., Cross-Claimants and Third
Party Plaintiffs-Appellants,
v.
LIVINGSTON CORPORATION et al., Cross-Claimants and Third
Party Defendants- Appellees.
 No. 78-1549.
 United States Court of Appeals,
Fifth Circuit.
 April 11, 1980.
Rehearing and Rehearing En Banc Denied June 30, 1980.
 
 Francis E. Mire, Lake Charles, La., for Ernest J. Ramos.
 J.L. Cox, Jr., Lake Charles, La., for Booker Drilling Co. and Liberty Mutual Ins. Co.
 Jones, Patin, Harper, Tete & Nolen, William M. Nolen, Lake Charles, La., for Harold Lee Engineering Co.
 Raggio, Farrar, Cappel & Chozen, Richard B. Cappel, Lake Charles, La., for Gardner-Denver Co.
 Woodley & Fenet, Edmund E. Woodley, Lake Charles, La., for Shell Oil Co.
 Brame, Bergstedt & Brame, Frank M. Brame, Lake Charles, La., for Oil Field Rental Service Co.
 James E. Diaz, Lafayette, La., for The Rucker Co.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before TUTTLE, FAY and THOMAS A. CLARK, Circuit Judges.
 FAY, Circuit Judge:
 
 
 1
 On this appeal, we review the district court's exclusion of evidence, its ruling that an oil rig is not subject to Louisiana strict tort liability, and its grant of summary judgment to one party. We affirm the grant of summary judgment. As to the other issues, we reverse and remand to the district court.
 
 I. FACTS AND PARTIES' POSITIONS
 
 2
 Ernest J. Ramos and Leon C. Fontenot were injured when the mast of the off-shore oil drilling rig on which they were working collapsed, telescoping within itself. Shell Oil Company (Shell) owned the oil drilling platform, and had contracted with Booker Drilling Company (Booker), the injured parties' employer, for Booker to perform services there. Ramos and Fontenot brought suit to recover for their injuries.[1] The case mushroomed to include numerous parties. Because virtually each party has a claim against all other parties, we will only attempt to highlight the roles these parties had in the suit. Booker claims its economic loss as a third-party plaintiff, and Liberty Mutual Insurance Company has intervened to recover the Longshoremen and Harbor Workers' benefits it paid Ramos and Fontenot.[2] The defendants remaining in this action[3] are Shell, the owner of the platform; Harold Lee Engineering Company (Lee), designer and manufacturer of the mast; Gardner-Denver Company, manufacturer of the drilling rig incorporating the Lee mast; Rucker Company, manufacturer of the pipe rams; Stewart & Stevenson Services, Inc., manufacturer of the accumulator which operates the blowout system; and Oil Field Rental Service Company, bailor to Shell of the rams and blowout preventor.
 
 
 3
 Lee constructs three-piece telescoping oil derricks or masts. Of the many it has sold, one went to Gulf Offshore Company (GO-4) in 1972, and one to Booker (B-30) in 1973. In the spring of 1972, the GO-4 rig collapsed because of a failure in the pins connecting the upper third of the telescoping mast to the top of the middle third. On March 29, 1974, the B-30 collapsed when the pins failed which connected the lower end of the middle third to the top of the bottom third. Persons injured in the GO-4 failure sued and recovered. In this trial over the B-30 collapse, Mr. Harold Lee testified that the same design calculations were used for GO-4 and B-30. When asked if the GO-4 had collapsed, Mr. Lee answered, "No." Appellants were not allowed to admit evidence of the GO-4 collapse, or of the failure to warn Booker of the GO-4 collapse, and the jury was not instructed to disregard Lee's answer, which went unimpeached because of the court's ruling on the collapse of GO-4.
 
 
 4
 Approximately ten days after the B-30 collapse, another mast, called B-40, was delivered to Booker. The B-40 mast incorporated design features that strengthened the mast in ways that would prevent collapses such as those occurring in the GO-4 and B-30 masts. The trial court excluded evidence of these improvements.
 
 
 5
 The trial court granted Shell a directed verdict on the appellants' actions for strict liability under Louisiana Civil Code Ann. Art. 2322 because Shell did not own the mast. The jury, by special verdict, found that Shell, Gardner-Denver, and Lee were not negligent, that the B-30 rig was not defective, and that Booker was negligent. The jury found that a tool joint had hit the rams causing the mast capacity to be exceeded.[4] Ramos, Fontenot, Booker, and Liberty Mutual appeal from the judgment. Shell, Lee, and Gardner-Denver perfected their appeals from the summary judgment for Oil Field Rental for consideration in the event this court reverses the judgment.[5]
 
 
 6
 No one disputes that at the time of the B-30 collapse, Booker was cementing and abandoning an oil well. During this process, the drilling pipes are withdrawn and at times the pipe rams of the blowout preventor system are closed. The pipe rams are doughnut-shaped pieces of metal and rubber that can contract to encircle the drilling pipe at its narrowest diameter, closing off the well. Where one piece of drilling pipe connects with another, the pipe's shape flares, increasing the diameter. If the drilling pipe is pulled up, the flared end will not pass through closed pipe rams.
 
 
 7
 The bulk of the trial transcript records the testimony of dueling experts. The appellees attempted to prove that when the Booker driller began to reverse out the drilling pipe, he forgot to reopen the rams or began to pull up the pipe at high speed before the rams were fully opened. According to appellees, the flared end of the drilling pipe crashed into the closed or partially opened rams, exceeding the mast's weight capacity and causing the collapse. Appellees' experts testified that although the rated capacity of the B-30 was 234,600 pounds, the shock load of the collision was about 700,000 pounds. The gist of appellees' argument is that operator error was the sole cause of the collapse.
 
 
 8
 Experts for appellants painted another picture of the occurrence. Appellants' experts testified that the indentation on the pipe ram did not match up with the drilling pipe. Alternative theories for the shock were that a hole in the outer casing caused the drilling pipe to snag, or that "junk" was left in the drilling hole by one of the defendants. According to appellants' experts, even if the tool joint hit the rams, calculations made from the indentations with all factors taken at their worst possible values indicated that the load was below the rated maximum, at between 198,000 and 220,000 pounds. Appellants' theory on the main cause of the collapse was defective design of the mast. Appellants' experts testified that the front legs of the mast were not designed to carry a sufficient load. The front legs crumpled, pulling out the front pins of the middle section and putting all the weight on the back legs, which caused the load to rest on the remaining two back pins. These pins and the saddles then ripped out of the back legs, collapsing the rig. Experts testified that small metal plates near the pins, better securing of the pins, and slight reinforcement to the front legs might have prevented the collapse. Experts also testified that under the American Petroleum Institute guidelines, all mast designs should include a safety factor. If a safety factor had been included, the mast would have held approximately 437,000 pounds. The core of appellants' argument is that operator error did not occur, but even if it did, a correctly designed mast would not have collapsed. Defects in design were the cause of the injuries.
 
 II. EVIDENCE OF SIMILAR ACCIDENT
 
 9
 Appellants claim the trial court erred in excluding evidence of the prior, similar collapse of a Lee mast. Although the trial court's ruling is not in the record, it apparently believed that evidence of the prior collapse was irrelevant, or that it would have been prejudicial.
 
 
 10
 Appellants contend that the prior GO-4 collapse is relevant.
 
 
 11
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 
 
 12
 Fed.R.Evid. 401. Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation. See Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 617 (5th Cir. 1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978); Nelson v. Brunswick Corp., 503 F.2d 376, 380 (9th Cir. 1974); Wojciechowski v. Long-Airdox, 488 F.2d 1111, 1116 (3d Cir. 1973); Julander v. Ford Motor Co., 488 F.2d 839, 846 (10th Cir. 1973); Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392 (5th Cir. 1972); Greyhound Lines, Inc. v. Miller, 402 F.2d 134 (8th Cir. 1968); Jones & Laughlin Steel Corp. v. Matherne, 348 F.2d 394, 400 (5th Cir. 1965). In the context of this case's factual disputes, obviously the GO-4 collapse could be relevant to Lee's notice of the defect, its ability to correct the defect, the mast's safety under foreseeable conditions, the strength of the mast, and, most especially, causation.
 
 
 13
 Because of the impact similar failures can have, the courts have developed principles governing their admissibility:
 
 
 14
 Whether a reasonable inference may be drawn as to the harmful tendency or capacity (of a product) from prior failures depends upon whether the conditions operating to produce the prior failures were substantially similar to the occurrence in question. The requirement that the prior accident not have occurred at too remote a time is a special qualification of the rule requiring similarity of conditions. The admission of such evidence is also subject to the reasonable discretion of the trial court as to whether the defendant is taken by unfair surprise and as to whether the prejudice or confusion of issues which may probably result from such admission is disproportionate to the value of such evidence.
 
 
 15
 Jones & Laughlin Steel Corp. v. Matherne, 348 F.2d at 400 (footnotes omitted). See Roundtree v. Seaboard Coast Line R. Co., 418 F.Supp. 220, 223 (M.D.Fla.1976). Appellants argue that the GO-4 and B-30 failures were similar and were not remote in time. They also claim that no unfair prejudice or confusion results from the admission.
 
 
 16
 The evidence does indicate similarity between the masts and their failures. Appellants' expert Mr. Green had inspected both the GO-4 and B-30.[6] Mr. Green had testified in the trial concerning the GO-4, in which those plaintiffs recovered. During appellants' offer of proof, Mr. Green testified in this matter that the masts and the failures leading to the collapses were virtually identical. In both, the derrick sprang out, causing the back pins to break. In both, according to Mr. Green, the mast was lifting less than its rated capacity. The differences between the GO-4 and its failure, and the B-30 mast and its collapse were insubstantial. The GO-4 mast had a rated capacity of 340,000 pounds, but failed at about 160,000. B-30 was rated at 234,600 and failed at 198,000 pounds. The GO-4 failure occurred at the connection between the top and middle sections; the B-30 between the middle and bottom sections. The GO-4 seats or saddles did not fail; the GO-4 broke at the pins and the housing on the pin connection to the supporting members. In B-30, both the pins and seats or saddles failed. Transcript at 538-44. Green also testified that GO-4 failed after about one month of operation. GO-4 was delivered in March, 1972, approximately two years before the B-30 collapse. Id. at 1137. Green related that before the B-30 collapse, GO-4 had been modified with a truss around the back, and is now in operation.
 
 
 17
 Although this should have been enough to establish the similarity between the masts and failures, other testimony from Mr. Lee of Harold Lee Engineering highlighted the similarity of the two masts. Transcript at 20-27. He stated that nothing in B-30 was new; some of the calculations for GO-4 were used in the manufacture of B-30. Id. at 1124-63. Lee testified that both GO-4 and B-30 had the same type legs and leg stress calculations. The basic difference is that GO-4 was installed vertically with a crane, while B-30 was scoped out horizontally and then lifted. Lee admitted there was very little difference between the two designs. When the plaintiffs requested production of the diagrams and documents for the B-30, at least two of the documents delivered by appellees were designs and calculations for GO-4. Record at 931-32.
 
 
 18
 We hold that the evidence of the GO-4 failure was relevant and that the mast and collapse were sufficiently similar to be admitted. In addition, the GO-4 failure was not too remote in time from the B-30 collapse. The trial court generally has broad discretion in the admission of evidence, but that discretion does not sanction exclusion of competent evidence without a sound, practical reason. Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 398 (5th Cir. 1972).
 
 
 19
 The probative value of the GO-4 evidence also was not outweighed by the possibility of unfair prejudice to appellees. The federal rule reads as follows:
 
 
 20
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 21
 Fed.R.Evid. 403. This was not an occasion, however, for the application of rule 403.
 
 
 22
 Of course, "unfair prejudice" as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be "unfair."
 
 
 23
 Dollar v. Long Mfg., N.C., Inc., 561 F.2d at 618. Any prejudice accruing from admission of the GO-4 evidence would not be unfair. Again, the trial court is usually accorded broad discretion in determining potential prejudice based upon the full array of evidence. Minnesota Farm Bureau Marketing Corp. v. North Dakota Agricultural Marketing Ass'n, Inc., 563 F.2d 906, 911 (8th Cir. 1977); Moran v. H.W.S. Lumber Co., Inc., 538 F.2d 238, 243 (9th Cir. 1976); Wallace v. Ener, 521 F.2d 215, 222 (5th Cir. 1975); Construction, Ltd. v. Brooks-Skinner Building Co., 488 F.2d 427 (3d Cir. 1973). Yet here the record does not disclose that any unfair prejudice would accrue to appellees if the evidence were admitted.
 
 
 24
 Another basis exists for admitting evidence of the GO-4 collapse: impeachment of Mr. Lee. On cross-examination Harold Lee testified as follows:
 
 
 25
 Q. (by Mr. Mire, plaintiffs' counsel) Well, actually, Mr. Lee, I see this (exhibit) is marked GO Number 4. Isn't that for the Gulf Offshore Number 4 Rig that you built prior to this?
 
 
 26
 A. (by Mr. Lee) Very possibly so.
 
 
 27
 Q. And that rig actually fell, did it not, this Gulf Offshore Number 4?
 
 A. No
 
 28
 (Followed by objection and in-chambers, off-record discussion by court and counsel).
 
 
 29
 Transcript at 24-25. Further evidence on the collapse was excluded. No charge was given to the jury to soften the blow of the witness's false statement.[7] We agree with appellants that the evidence should have been admitted to impeach Mr. Lee. Cf. Dollar v. Long Mfg., N.C., Inc., 561 F.2d at 618 (under rule 407, evidence of repairs admissible for impeachment).
 
 III. EXCLUSION OF B-40 CHANGES
 
 30
 The trial court also excluded evidence of the B-40 mast's new design.[8] Mr. Booker would have testified that the B-40 mast had extra plates and more welding than the B-30. Transcript at 551-54. The Federal Rules of Evidence require exclusion of evidence of subsequent remedial measures when offered to prove negligence or culpable conduct:
 
 
 31
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
 
 
 32
 Fed.R.Evid. 407. The grounds for the rule are that remedial conduct is not an admission,[9] and that admission of the evidence might discourage steps to improve safety. Advisory Committee's Note, 46 F.R.D. 161, 236-37 (1969); Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392 (5th Cir. 1972). Subsequent design modifications can be admissible to prove, for example, the feasibility of precautionary measures. E. g., Boeing Airplane Co. v. Brown, 291 F.2d 310 (9th Cir. 1961). See Advisory Committee's Note, 46 F.R.D. at 237.
 
 
 33
 But we need not wrestle with the rule's exceptions because it appears the B-40 changes do not come within rule 407's proscription. The B-40 was delivered approximately ten days after the B-30 collapse. Given Lee's extensive testimony on the time required to manufacture a mast, the B-40 mast apparently was not produced "after (the B-30) event."[10] If these are the facts, the B-40 changes should not have been excluded as subsequent remedial measures.
 
 
 34
 If the B-40 design changes were made a significant period of time prior to the collapse of B-30, they were certainly relevant to the cause of the collapse, appellees' failure to warn despite preaccident knowledge of the problem, and the feasibility of alternatives. On retrial, the district court should develop fully the time interval involved as well as all other pertinent factors and articulate those reasons allowing or precluding such evidence under the Federal Rules of Evidence.
 
 IV. SHELL'S STRICT LIABILITY
 
 35
 Although the grounds for the ruling are not in the record, the district court granted Shell's motion for a directed verdict on the strict liability action under Louisiana Civil Code Art. 2322, apparently because Shell was not the "owner" of the mast. That code section states:
 
 
 36
 The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it or when it is the result of a vice in its original construction.
 
 
 37
 La. Civil Code Ann. Art. 2322 (West 1979). At the time of the ruling the Louisiana courts had not ruled on the applicability of Art. 2322 to a situation like this one. Unfortunately, the trial court erred in guessing which way the Louisiana courts would rule. In Olsen v. Shell Oil Company, 365 So.2d 1285 (1978), the Supreme Court of Louisiana answered certified questions from this court on facts similar to Ramos. The court, in an opinion by Justice Tate, first held that a drilling platform is a "building" within the meaning of Art. 2322. Id. at 1289-90. The court reaffirmed that appurtenances to structures can be included within the meaning of the term "building." Id. at 1291. The court then held that while an owner could contract with an occupant to regulate relative "ownership" of incorporated appurtenances and to provide for indemnification, an owner cannot limit by contract his nondelegable duties to third persons injured by defects in the building. Id. at 1291-92. The court held that the explosion in Olsen was a "ruin." Id. at 1292-93. The court noted that if the fault in the building were caused by some third person, the person injured, or some irresistible or unforeseeable force, the owner might not be liable. Id. at 1289. The court rejected, however, the argument that actions by the tenant-independent contractor in Olsen absolved the owner of its nondelegable duties. Id. at 1293. Only when the third person's actions are the sole cause of the damage, in the nature of a superseding cause, will the owner be exonerated. When the "third person" is a stranger, not one acting with the owner's consent, the owner cannot avoid 2322 liability. Id. at 1293-94.
 
 
 38
 As in Olsen, Shell owns a drilling platform which qualifies as a "building" under 2322, and the mast is appurtenant to the platform. See McIlwain v. Placid Oil Co., 472 F.2d 248, 250 (5th Cir.), cert. denied, 412 U.S. 923, 93 S.Ct. 2734, 37 L.Ed.2d 150 (1973). The derrick collapsed, and was therefore "ruined" within the statute's meaning. See Moczygemba v. Danos & Curole Marine Contractors, 561 F.2d 1149, 1152 n. 6 (5th Cir. 1977). Appellants claim the derrick had defects in its repair and original construction.[11] Shell argues, however, that in this case, unlike Olsen, a third person's actions were the sole cause of the damage. Even if we were to accept Shell's position, we do not believe that all the evidence pointed so strongly and overwhelmingly in Shell's favor that the court should have removed the question from the jury. Boeing Company v. Shipman, 411 F.2d 365, 374-77 (5th Cir. 1969) (en banc). Shell points to the jury's findings of no defect in the mast and of negligence on Booker's part as rendering the court's error harmless. See Moczygemba v. Danos & Curole Marine Contractors, 561 F.2d at 1152. As discussed earlier, however, the trial court erred in excluding certain evidence relevant to the question of defects. Because this evidence touches on the cause of the collapse, the error in directing the verdict is not harmless. See Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392 (5th Cir. 1972).
 
 V. BAILOR'S LIABILITY
 
 39
 Lee,[12] Gardner-Denver, and Shell appeal the granting of summary judgment to Oil Field Rental Service Company (OFR), which had leased the blowout preventor, rams, and accessory equipment to Shell. OFR inspected and tested the bailed equipment approximately one month before the collapse. The district court held that there was no evidence that OFR's inspections were performed in a manner which would not disclose present defects, and therefore OFR was not liable under Louisiana law. Lyons v. Jahncke Service, Inc., 125 So.2d 619 (La.App.1960).
 
 
 40
 Louisiana law is settled on a bailor's liability:a bailor for value received who delivers such a vehicle or machine to his bailee possessed of a defect of which he was aware or could have detected by ordinary examination, without warning bailee thereof, is liable in damages to bailee or any third party injured thereby, provided such injury is the reasonably foreseeable result of such failure.
 
 
 41
 Lyons v. Jahncke, 125 So.2d 619, 631 (La.App.1960). See also Blandino v. Brown Erection Co., Inc., 341 So.2d 577 (La.App.1977); Jenkins v. Dixie Rental Tools and Casing Crews, Inc., 283 So.2d 271 (La.App.1973), cert. denied, 285 So.2d 542 (La.1973); Dore v. Hartford Accident & Indemnity Co., 180 So.2d 434 (La.App.1965); White v. Huspeth, 147 So.2d 874, 879 (La.App.1962), cert. denied, 243 La. 1018, 149 So.2d 768 (1963).
 
 
 42
 Our review of the evidence must be in the light most favorable to Lee, Gardner-Denver, and Shell. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Marshall v. Victoria Transportation Co., 603 F.2d 1122, 1123 (5th Cir. 1979). When viewed in this fashion, the evidence discloses that OFR satisfied its duty by making a reasonable inspection. The award of summary judgment to OFR was proper.
 
 VI. CONCLUSION
 
 43
 After a long and hotly fought trial, an appellate court is reluctant to overturn the rulings of a district judge. Nevertheless, relevant evidence which engenders no unfair prejudice and which relates to the core of the dispute should not be summarily excluded. In addition, the recent clarification of Art. 2322's applicability requires reversal of the directed verdict for Shell. The district court's grant of summary judgment to Oil Field Rental is AFFIRMED; the directed verdict and other final judgments are REVERSED; and the matter is remanded for retrial.
 
 
 
 [1]
 Jurisdiction is grounded on the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1333 (West 1979). Under that act, the law of Louisiana, the adjacent state, applies. Rodrique v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1968)
 
 
 [2]
 Ramos and Fontenot originally sued Booker and Liberty Mutual, but those actions were dismissed and that decision has not been appealed. Cf. Longmire v. Sea Drilling Corp., 610 F.2d 1342 (1980) (floorhand on drilling platform entitled to section 905 action against vessel under Longshoremen's and Harbor Workers' Compensation Act)
 
 
 [3]
 Orders of summary judgment and dismissal were granted to numerous other parties-defendant who will not be enumerated here
 
 
 [4]
 The full jury verdict is as follows:
 "VERDICT OF THE JURY
 We, the Jury, hereby return our unanimous findings from a preponderance of
 the evidence in the case in answer to the interrogatories propounded to us by
 the Court, as follows, to-wit:
 INTERROGATORY NO. 1:
-----------------------------------------------
 Was Shell Oil Company guilty of any negligence which was a proximate cause of
 the accident?
 Answer "Yes" or "No". ANSWER: No
 ----
 INTERROGATORY NO 2:
-----------------------------------------------
 Was Gardner-Denver Company guilty of any negligence which was a proximate
 cause of the accident?
 Answer "Yes" or "No". ANSWER: No
 ----
 INTERROGATORY NO. 3
-----------------------------------------------
 Was Harold Lee Engineering Company guilty of any negligence which was a
 proximate cause of the accident?
 Answer "Yes" or "No". ANSWER: No
 ----
 INTERROGATORY NO. 4(A):
-----------------------------------------------
 Was the mast as manufactured by Harold Lee Engineering and incorporated into
 the rig sold by Gardner-Denver defective?
 Answer "Yes" or "No". ANSWER: No
 ----
 If the answer to 4(A) is "no", then do
 not answer 4(B), 4(C), and 4(D).
 INTERROGATORY NO. 4(B):
-----------------------------------------------
 Was the mast in normal use at the time of the accident?
 Answer "Yes" or "No". ANSWER: ____
 INTERROGATORY NO. 4(C):
-----------------------------------------------
 If so, was the mast unreasonably dangerous in normal use?
 Answer "Yes" or "No". ANSWER: ____
 INTERROGATORY NO. 4(D):
-----------------------------------------------
 Was the accident proximately caused by the defect?
 Answer "Yes" or "No". ANSWER: ____
 INTERROGATORY NO. 5:
-----------------------------------------------
 Was Booker Drilling Company guilty of negligence which was a proximate cause
 of the accident?
 Answer "Yes" or "No". ANSWER: Yes
 ----
 INTERROGATORY NO. 6:
-----------------------------------------------
 Do you find that the tool joint struck the rams?
 Answer "Yes" or "No". ANSWER: Yes
 ----
 INTERROGATORY NO. 7:
-----------------------------------------------
 If your answer to number 7 is "Yes", do you find the blow to the rams caused
 the represented capacity of the mast to be exceeded?
 Answer "Yes" or "No". ANSWER: Yes
 ----
 Lake Charles, Louisiana
 July 20, 1977
 Mrs. Warrene Boyd Adams
 --------------------------
 FOREMAN OF THE JURY"
 
 
 [5]
 Ramos, Fontenot, Booker, and Liberty Mutual will be referred to as "appellants" in this opinion. Shell, Lee, Gardner-Denver and the other defendants, cross-claimants, and third-party defendants will be called "appellees," even though some of them are also third-party plaintiff appellants
 
 
 [6]
 Mr. Green had been called in to inspect four failures involving Lee masts, three of which were collapses in which the mast retelescoped within itself
 
 
 [7]
 The transcript provided on appeal is not the best. Not only are witnesses' testimonies reproduced incompletely and out of order, but the transcript also omits opening arguments, legal discussions, closing arguments, and the jury charges. It is therefore often unclear why the trial judge made many rulings or whether the trial court instructed the jury on a particular point. Evidently both parties agree, however, that the jury was not instructed to disregard the question and answer, and that the evidence was excluded as a dissimilar accident after the offer of proof by witness Green
 
 
 [8]
 On the admission of the B-40 evidence, the court stated the following:
 THE COURT: All right. In justification of the Court's interpretation of this matter, the Court doesn't feel that the day of the accident is a matter that is particularly the matter in point; that if in fact an improvement was made in the manufacturer (manufacture?) of one Rig 30 to the manufacturer to the manufacturer and delivery of Rig 40. And the Court, regardless of when the accident happened, would rule the same way. In other words, I feel that the date of the accident is not important. The product is what I am comparing.
 Transcript at 549-50. While the ruling is not entirely clear, it was in response to the following objection, which is clearly grounded on rule 407:
 MR. NOLEN: Yes, sir. I objected to that line of questioning on the grounds that it was an attempt to show a post accident change in a similar product for the purpose of showing a defect in this product, which we felt was improper.
 Id. at 549.
 
 
 [9]
 (T)he rule rejects the notion that "because the world gets wiser as it gets older, therefore it was foolish before." Hart v. Lancashire & Yorkshire Ry. Co., 21 L.T.R.N.S. 261, 263 (1869)
 Advisory Committee's Note, 46 F.R.D. 161, 236 (1969).
 
 
 [10]
 Neither party discusses whether the B-40 changes should be excluded as subsequent to the GO-4 collapse
 
 
 [11]
 We note that Olsen, unlike Ramos, definitely dealt with a defect in repair, not construction. Neither party cites to precedent distinguishing repair and construction although logically one might expect that construction defects might be more likely to entail superseding causes wholly unrelated to duties of the owner
 
 
 [12]
 Despite its present appeal, Lee did not oppose the motion for summary judgment at the time it was made. Record at 3708. Gardner-Denver argued that despite OFR's affidavits, whether the inspection satisfied the bailor's burden is a question of fact. Id. at 3971-72