**DAVIDSON OIL COUNTRY SUPPLY CO., INC., Appellant,**

v.

**KLOCKNER, INC., Appellee.**

**No. 89–2221.**

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1990.

Eugene B. Wilshire, Jr., Patrick J. Dyer, Wilshire, Scott, Halbach & Dyer, Houston, Tex., for appellant.

Rick L. Oldenettle, Gilpin Maynard, Houston, Tex., Kenneth L. Everett, Paul J. O'Neill, Jr., New York City, for appellee.

Before BROWN, WILLIAMS, and JONES, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### Prologue

Davidson Oil Country Supply Co., Inc. (DOCS) bought tubular materials from Klockner, Inc. (Klockner). Klockner had purchased the tubular goods from an Italian mill called Ferrotubi. Ferrotubi manufactured the pipe. DOCS's purchase orders specified that the materials were to be J–55 ERW API tubing.[1] DOCS sold the pipe to customers who used it in well operations. Two of those customers experienced downhole weld seam failure in the pipe.

DOCS's primary claim was that the Ferrotubi materials contained a latent manufacturing defect which made those materials unmerchantable as API-grade. Thus DOCS claims the tubing was sold in breach of the warranty of merchantability.[2] To establish unfitness and noncompliance with the API specifications, DOCS sought to offer evidence of several instances of the failure of the same or similar Ferrotubi pipe.[3] Beginning with its granting of a *motion in limine*, applied throughout the jury trial, the trial court rejected as inadmissible any failure of Ferrotubi pipe other than that sold by Klockner to DOCS. The exclusion of this evidence is the principal issue in the case.[4]

We hold that the trial court prejudicially erred and remand for a new trial.

### The Motion in Limine

Prior to the jury voir dire the trial court heard Klockner's motion in limine which sought the exclusion of many categories of evidence, among them evidence of failures involving Ferrotubi materials [5] not sold by

---

1. The American Petroleum Institute promulgates specifications for tubing that is used downhole in oil and gas wells. The API designation J–55 is a grade used to indicate the material's chemical composition and tensile strength. The letters ERW refer to "electric resistance welded" pipe. This kind of pipe has a seam and is made by rolling a piece of steel around a mandrel and welding the resulting seam together. An annealing process is then used to strengthen the weld. All of the pipe involved in this case was ERW and was supposed to meet the API J–55 standard.

2. The claim in chief arises under the Texas Uniform Commercial Code (Texas UCC). DOCS also challenges Klockner's good faith under the Texas Deceptive Trade Practices—Consumer Protection Act (Texas DTPA).

3. DOCS had also purchased identical Ferrotubi pipe from a company called TAD. Three of DOCS's customers experienced downhole weld seam failure in this TAD-supplied pipe. This constituted the bulk of the evidence of similar failures DOCS sought to introduce.

4. Based on the evidence it heard, the jury returned 30 out of 31 special interrogatories in favor of Klockner. Judgment was entered in favor of Klockner on all issues.

5. Klockner's motion asked the court to "exclude and to order parties and counsel to refrain from any reference to the following types of evidence:"

   1. *Evidence of Other Failures and Threading Problems Involving Ferrotubi Material Not Supplied by Klockner.* Plaintiff has identified as potential exhibits certain claims files and documents concerning other failures, threading problems and incidents involving Ferrotubi material not sold by Klockner. This evidence includes but is not limited to claims filed by or against and/or problems experienced by Intercontinental, Damson Oil Corporation, Trident Steel Corporation, Pharaoh and Associates, Inc. and Quanex Corporation.

      The pipe concerned in the above transactions was sold by TAD–USA to DOCS. Klockner was a complete stranger to the transactions. This evidence, therefore is *res inter alios acta*, absolutely and totally irrelevant to any issue in this case. This evidence can only serve to confuse the jury with collateral issues, to deprive Klockner of a fair trial and to burden the court with trying several lawsuits, rather than one. *Texas Farm Bur. Mut. Ins. Co. v. Baker*, 596 S.W.2d 639, 642 (Tex.Civ. App.—Tyler 1980, writ ref'd n.r.e.) (prior acts or transactions by one of the parties with other persons are irrelevant, immaterial and highly prejudicial).

      Even if DOCS could show substantial similarity and relevance of other failures to the facts of this litigation, information regarding other failures and problems would not necessarily be admissible. There must be a weighing of "the dangers of unfairness, confusion, and undue expenditure of time in the trial of collateral issues against the factors favoring admissibility" before information on other failures may be admitted. *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351, 1356 (5th Cir.1983); ...

      ... In order for Klockner to meet and rebut evidence concerning other alleged failures, it would be necessary for Klockner to fully and completely litigate the factual circumstances underlying each such *allegedly similar* failure,

Klockner. The trial court's position on this issue was made clear by its first statement with regard to the motion in limine: "Well, there's not much there that's really of any import." (Vol. 20 p. 3). The trial court rejected the arguments put forth by DOCS.[6] Klockner's counsel responded by agreeing that the rule in this circuit favors admission, but distinguished those cases because they were all brought against the manufacturer rather than a seller of the goods. Klockner also raised several other arguments, none of merit, against admissibility.[7]

In addition to the general similar occurrence evidence Klockner sought to exclude, they specifically wanted to exclude a Southwestern Laboratories report which analyzed one of the pipe failures. Their objections were on relevancy and hearsay grounds.[8] DOCS's counsel responded that

and thereby completely subsume the relevant issues in this case with a flood of collateral issues. Any discussion of other failures would divert the jury's attention from the issues at bar and waste scarce judicial time and resources....

2. *Testimony of Howard Smith Regarding Problems With Ferrotubi Material....* Mr. Smith's [deposition] testimony concerned problems he experienced with Ferrotubi material purchased by Quanex from TAD–USA. ... Again, Klockner was a complete stranger to the transactions between Quanex and TAD–USA and, therefore should not be held accountable for problems experienced by Quanex.

. . . . .

3. *Pleadings, Documents and Factual Information Regarding Proceedings and Judgments From Other Litigation....*

4. *Insurance....*

5. *Unavailability of Witnesses....*

6. *Reference to Relative Wealth....*

7. *Southwestern Laboratories Report dated March 22, 1982.* The Plaintiff has identified as a potential trial exhibit a laboratory report prepared by Southwestern Laboratories dated March 22, 1982. The Plaintiff has admitted the report pertains to a drill pipe failure experienced by Trident Steel Corporation. The Plaintiff has also admitted in answers to interrogatories that TAD–USA, Inc. sold the pipe to DOCS. Klockner was in no way involved in the Trident Steel sales transaction and subsequent pipe failure made basis of the report. The report, therefore, bears no relation to the events in issue. Use of the report at trial would unduly confuse the jury and greatly prejudice Klockner.

Further, the report constitutes hearsay and contains statements, findings, opinions and assertions made out of court by persons whom Klockner has not had an opportunity to cross-examine and, therefore, is patently inadmissible under Federal Rule of Evidence 802. The introduction of such material is also prohibited by the requirement of the Fourteenth Amendment's guarantee of due process of law in that the statements and opinions reflected therein are not subject to cross-examination and their introduction as probative evidence does not comport with the constitutional requirements of fundamental fairness.

. . . . .

7. [sic] *Southwestern Laboratories Report dated June 23, 1981. ...*

8. *Improper Arguments....*

9. *Matters Not Disclosed by the Exhibit List. ...*

10. *Undisclosed Experts....*

11. *Settlement....*

12. *Addressing Counsel....*

13. *Reference to Motion in Limine....*

6. DOCS's counsel urged:

Your Honor, that's the guts of the case. We're talking about a latent product defect, all of which originated with one manufacturer under a bad manufacturing process.

I don't think there's any question but at least for twenty-one years the rule in this circuit has been that you can show latent defect with similar accidents.

We had the same types of failures over and over again, and it was that that led us to, that compelled us to downgrade this material and sell it for non—for bad use.

7. Klockner pointed to the facts that (i) DOCS had reached settlement with another seller, (ii) there is a state court case pending against the manufacturer in which this evidence might be relevant, (iii) there was a suit brought regarding the Crown Central failure, (iv) Klockner did not have all the information about the failures, (v) and with regard to one failure for which Klockner did have information, it appeared that seamless pipe was involved.

8. Klockner took the position that:

... The lab report is not dealing with pipe that was sold, and we have objected to it on that ground, relevancy point.

And we've also objected on the basis of hearsay because there's been no one designated from Southwestern Laboratory Reports as an expert to come in and testify about it.

They did designate a custodian of records, but we believe that is prejudicial and unfair to Klockner to have a report admitted, and we've never been given an opportunity to cross-examine somebody about opinions they have put in there.

Klockner had knowledge of the reports[9] since before the lawsuit was commenced and had the opportunity to depose Southwestern Laboratories about them.[10]

After hearing and considering the arguments on these and other aspects of the motion in limine, the trial judge granted it in nearly all respects. The only exceptions made were to allow a certified copy of the petition to be admitted and to allow references to Klockner's parent company. At first, the trial judge indicated that this was a preliminary ruling and that "it doesn't mean that you can't get around it at that time but you need to approach the bench and we will discuss it ahead of time."[11]

DOCS's counsel immediately asked the court to reconsider and to consider the cited case law. As DOCS's counsel pointed out, "You have in fact instructed a verdict against me if this evidence does not come in. Our whole case for four-and-a-half years has been built on the latent defect in this product. If I can't prove that, then my case has been taken away from me." The following exchange ensued:

THE COURT: Let me ask you this: What relevance does it have if other tubes fail? Why can't you prove it just through what happened here in this case?

MR. WILSHIRE: Because the question is when you have a latent defect, it cannot be tested for adequately. And you have the same failure coming over and over again from the same manufacturer.

The point of focus is on the product, not on who sold it. The one case that addressed that specifically, Your Honor,

is an Audi case that said it doesn't matter who the distributor is if the manufacturer has a latent defect. That is what we've got. It's clear happenstance.

THE COURT: Again, why can't you prove it as to just the pipe in this case?

MR. WILSHIRE: Well, because they would say that two failures as opposed to 13, all of which are alike, wouldn't be enough.

But when you have got a person standing here holding a group of pipe of which he has evidence of as a reasonable businessman has failed downhole as many as 13 times, the question is the integrity of that product, not who sold it to him.

Who sold it to him is a matter of happenstance. We're not trying to hold them for damages on those extraneous, but we're trying to let this jury understand why we say there's a latent defect and why we had to downgrade it and why its not merchantable.[12]

After examining DOCS's authority,[13] the trial judge made his final ruling which he adhered to throughout the trial:

All right. Motion to reconsider is denied. Motion in limine stays.

I've read the plaintiff's trial memorandum, and I'm stating that similar happenstance, similar occurrences with other clients *will not be admitted.*[14]

DOCS tried again to admit this evidence through narrative offers of proof during trial. (Vol. 24 pp. 3–5). At this time, DOCS sought to introduce (i) the testimony of Walton and Clark (DOCS officers) that DOCS customers, *see supra* note 3, had

---

**9.** Although Klockner's counsel spoke in the singular, the motion in limine indicates that there are two Southwestern Laboratory reports at issue. The first, dated March 22, 1982 analyzes the failure of TAD-supplied Ferrotubi pipe in a Trident Steel well. The second, dated June 23, 1981, analyzes the failure experienced by TOS of Klockner-supplied Ferrotubi pipe.

**10.** DOCS responded as follows:

... Your Honor, before the lawsuits were started, they were presented with those Southwestern Laboratory reports.

They have been here for four years. They have never been questioned by anybody. If they had any questions about what we main-

tained in there, they could have called Mr. Kahn and deposed him. I think that's ridiculous to bring that up at this time, saying they didn't have the chance to cross-examine.

**11.** The trial judge retreated from this initial position. *See infra,* text accompanying note 14.

**12.** Vol. 20 pp. 16–17.

**13.** DOCS's counsel submitted a trial memorandum during the argument on the motion in limine which the court then reviewed before denying reconsideration.

**14.** Vol. 20 p. 22 (Emphasis added).

three additional downhole failures with Ferrotubi materials manufactured during the relevant time; (ii) the business records of six additional companies who experienced downhole failures of J–55 ERW Ferrotubi materials manufactured during the relevant time; (iii) DOCS's business records documenting the failures of all its clients; (iv) the testimony of Smith from Quanex Corp. regarding their downhole failures with Ferrotubi ERW materials, their threading problems, and their ultimate rejection of their entire Ferrotubi inventory which Ferrotubi accepted; and (v) a letter of Ferrotubi's metallurgist explaining the reason for the failures.[15] DOCS offered this evidence,

> ... to show that there is a clear likelihood of latent manufacturing defect and improper mill inspection, defects and problems that compelled the conclusion that ERW material manufactured by Ferrotubi Corbetta between—during the years 1980 and 1981 could not be sold and used for downhole drilling and completion requiring pipe with properties and characteristics and manufacturing integrity equal to J–55 API material.

This offer of proof was denied.

In another attempt to get some of this "gut issue" evidence in, DOCS immediately made a limited offer of proof by which it attempted to introduce that part of the evidence showing (i) Klockner's knowledge of problems with the Ferrotubi materials in March 1982 and (ii) the type of information relied on in the trade to make a reasonable decision to downgrade. This offer was also denied.

Three main categories of evidence were excluded by the motion in limine.

A. *Evidence of TAD–Supplied Ferrotubi Failures.* DOCS bought its Ferrotubi

inventory from both Klockner and TAD. Three downhole failures—all in the weld seam—occurred in Ferrotubi material known to have been supplied by TAD. DOCS was precluded by the motion in limine from telling the jury about these failures. It was also precluded from telling the jury that it had downgraded the TAD supplied Ferrotubi materials and that TAD had accepted the downgrade. The exclusion of this evidence enabled Klockner's counsel in closing argument to urge that DOCS never had downgraded its Ferrotubi inventory.

In order to show these facts, DOCS offered, and was not allowed to present, (i) testimony of Walton and Clark (DOCS officers) that failures in Ferrotubi pipe sold to DOCS by TAD had in fact occurred, (ii) DOCS's claim files prepared for each of those failures along with authenticating and explanatory testimony, (iii) a Southwestern Laboratories report attributing one of those failures to improper heat treatment, (iv) a Ferrotubi report prepared for TAD and delivered to Klockner by DOCS in which Ferrotubi admitted to "repeated and numerous instances" of defects in its ERW material, and (v) testimony by three experts that five downhole failures in a particular product renders that product unmerchantable as API material.

All of this evidence was offered to show the unmerchantability of the Ferrotubi material as API grade. All of the evidence related to Ferrotubi ERW materials and by it, DOCS attempted to show a defect in the manufacturing process by which there was an improper heat treatment of the weld seam which caused the failures. The exclusion prevented DOCS from showing that materials which had suffered five downhole weld seam failures were unmerchantable because they could not "pass without objec-

---

15. DOCS learned from TAD in 1982 that Ferrotubi had conducted some tests of its own on failed ERW material. The Ferrotubi metallurgist detailed the failure of the materials to meet proper standards. This letter had been previously offered and excluded by the court. The relevant portion states:

> By testing directly and indirectly the 6 defective tubes, we have found similar and repeated situations. The first is that all the

samples have been produced with steel coming from the same supplier.

Further, to a not perfect metallographic structure due to numerous inclusions, deriving for the most part from manganese oxides and carbon oxides, we can notice a not sufficient annealing process.

The whole of these situations produces brittlenes [sic] in the welded structure, which failed during the 2nd hydraulic test.

tion in the trade." Tex.Bus. & Com.Code Ann. § 2.314(b)(1) (Vernon 1968).

The exclusion also allowed Klockner to make closing arguments based on facts it knew to be untrue. Klockner argued that the materials were merchantable because even if two failures had occurred in Klockner-supplied materials, that was a normal rate of failure in the industry. Klockner argued that the absence of other failures showed there was no defect. Thus the scarcity of instances of Ferrotubi pipe failure that the jury was allowed to hear about—because of the trial court's rulings on the motion in limine and the offers of proof—turned into affirmative proof of the lack of a defect. Klockner also argued that DOCS had never had the failed pipe tested; even though Klockner prevented DOCS from proving this by the Southwestern Laboratories and Ferrotubi test results.

B. *Evidence Relating to How the Other Claims were Handled.* DOCS offered several telexes by and between Klockner & Co., Klockner, TAD and Ferrotubi to show that Klockner was aware of the quality problems, that it was not acting in good faith by taking action to conceal the problems, and that it did not intend to honor the warranty claims. For example, in March 1982, Klockner sent a telex to Klockner & Co. (its German parent company) referring to six well failures and acknowledging a "tremendous quality problem with the Ferrotubi material." The court excised the reference to "6" failures. After TAD reached agreement with DOCS and agreed to accept the downgrade, the telexes show that Klockner was upset by TAD's failure to work in concert with Klockner and threatened legal action against TAD for acknowledging unfitness by accepting the downgrade.[16] These also were not admit-

ted. The jury never got to see the gun or the smoke of this smoking gun.

C. *Evidence Relating to Failures in Other Ferrotubi Material.* The court also excluded references to other failures or problems associated with Ferrotubi material. As an example, DOCS offered evidence, through the testimony of Smith, that Quanex Corp., another tubular goods supplier, purchased a large inventory of Ferrotubi ERW material. Quanex experienced downhole failures due to weld seem splits in this pipe. Ultimately, Quanex rejected the entire inventory and the Ferrotubi mill accepted that rejection.[17] DOCS tried to introduce evidence of six other unrelated companies who had experienced quality problems with Ferrotubi J–55 ERW materials.

DOCS asserts that this evidence, none of which the jury heard, would have established its claim that the Ferrotubi material was defective due to an improper seam annealing process. More than that, its exclusion contributed to the discrediting of DOCS's witnesses who were limited to telling of only the two failures in Klockner-supplied Ferrotubi materials.

### Similar Occurrence Evidence Admissible

■ We agree with DOCS that evidence of similar failures was improperly excluded. This includes evidence of failures in Ferrotubi materials DOCS bought from TAD and Klockner as well as failures experienced by other purchasers or users of Ferrotubi ERW, API materials. All relevant evidence is admissible in a jury trial, F.R.Evid. 402, unless its probative value is outweighed by, for example, the danger of unfair prejudice or confusion of the issues, F.R.Evid. 403, a finding not made or avail-

---

**16.** The telex from Klockner & Co. to TAD said, in pertinent part:

> As you are confrontated directly with the same problems it was understood that all steps to be taken had to be mutually agreed upon. We are therefore very surprised to learn from Houston that you have decided positively on [DOCS] request to consider all remaining material as non-API material giving in the same time a considerable price-re-

duction. As we still have important outstandings with the above mentioned customer such steps from your side would prejudice our situation and therefor we have to hold you responsible for any demages to us if it is true that such steps had been taken from your side as prescribed above.

**17.** Quanex also experienced extensive failures in hydrotesting and threading this material.

able in this case. Merely because the testimony is adverse to the opposing party does not mean it is *unfairly* prejudicial. *Dollar v. Long. Manufacturing, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). Frequently relevant testimony hurts as the opposing party hopes. The jury was entitled to weigh this evidence and determine whether or not it established DOCS's claims.

We begin with the observation that DOCS's primary claim was that the Ferrotubi materials had a latent manufacturing defect which made those materials unmerchantable as API material. Thus the materials were sold in breach of their warranty of merchantability. Klockner made this warranty as a seller of the Ferrotubi materials.[18] Under this theory, the introduction of evidence of failures in the Ferrotubi products sold by TAD was offered to prove the claim that the Ferrotubi products contained a manufacturing defect. It was not offered to allow DOCS to recover from Klockner for failures in material Klockner did not sell.

The support for admissibility of such evidence is clear. *See, e.g., Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1082–83 (5th Cir.1986) (court must admit evidence of accidents that are "substantially similar," which is defined by the defect or the product); [19] *Ramos v. Liberty Mutual Insurance Co.*, 615 F.2d 334, 338–39 (5th Cir.1980), *cert. denied sub nom. Rucker Co. v. Shell Oil Co., et al.*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981) ("Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation."); *Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 400 (5th Cir.1965).

■■ .The trial court's discretion to admit or exclude evidence is generally broad, but competent evidence cannot be excluded without a sound and acceptable reason. *Ramos,* 615 F.2d at 340, *citing, Bailey v. Kawasaki–Kisen, K.K.*, 455 F.2d 392, 398 (5th Cir.1972). We find no such reason and the trial court did not provide one. Since the excluded evidence was clearly relevant to the questions of merchantability and good faith, and as will be seen, its exclusion seriously hindered the presentation of DOCS's case, the trial judge abused his discretion, which calls for reversal. *See* F.R.Evid. 103(a).

Klockner contends that the cases cited by DOCS and adopted by this Court are not applicable for two reasons. First, Klockner argues, they were all suits against the manufacturer of a product, not the seller. This distinction is irrelevant since Klockner as a seller warranted that the pipe was merchantable.[20] Second, Klockner argues that all of these cases dealt with design defects, not manufacturing defects. It is hard, if not impossible, seriously to entertain any such distinction. Products are frequently defective because of faulty design. If the method of manufacture results in a product unfit for the purposes for which it is made, that product is defective.[21]

DOCS's evidence all related to Ferrotubi ERW API grade tubular goods made at

18. Texas UCC § 2.314(a). provides:
Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
Further, UCC § 2.314(b) provides:
Goods to be merchantable must be at least such as
(1) pass without objection in the trade under the contract description....
Klockner's sales contract described the pipe it sold as:
ERW Casing API STD 5A, latest edition, Grade J 55, Range 3, with plain end 65 degree beveled, with mill test certificates.

Defendant's Exh. 2.

19. *Jackson* went even further, and relaxed the rule requiring substantial similarity for the purposes of proving the defendant's notice of the problem—an issue also faced in the case at bar in connection with DOCS's DTPA claim. "Any differences in the circumstances surrounding these occurrences go merely to the weight to be given the evidence." *Id.* at 1083.

20. *See supra* note 18.

21. *See Jackson,* 788 F.2d at 1073, 1076 (case dealt with problems of "design, manufacture, and marketing"); *Jones & Laughlin,* 348 F.2d at

**1246**

approximately the same time. All of the failures occurred in the same manner—a weld seam rupture downhole. All of this evidence is obviously relevant to DOCS's claim that the Ferrotubi materials were defective. In addition, much of it is relevant to establishing Klockner's knowledge of the defect and its asserted bad faith in dealing with DOCS's claims.

Rule 403 offers no basis for the exclusion of this evidence.[22] Although this evidence is most certainly harmful to Klockner, it is not *unfairly* prejudicial. *See Dollar, supra.* This evidence was available to Klockner for years before the case went to trial. Discovery was had or was available to explain or discredit it. Witnesses were available for Klockner to cross-examine. Klockner had its own experts available to explain the evidence.

Klockner's additional arguments in support of the trial court's rulings may be easily disposed of. First, Klockner asserts that DOCS's failure to use the word "similar" in its opposition to the motion in limine was fatal.[23] We dismiss this argument as completely baseless. Much of the evidence excluded showed similarity. The weight of that showing was for the jury. Further, the trial court did not base its decision on this ground, but acknowledged that it was excluding evidence of "similar occurrences." [24]

Next, Klockner spuriously argues that the excluded evidence could not be relevant because the jury concluded, based on Klockner's evidence (and the limited amount of evidence DOCS was allowed to

present), that the Ferrotubi material it supplied was not defective and that DOCS never downgraded. This begs the question. The evidence DOCS sought to put on would not only have disputed Klockner's evidence thus creating an issue for the jury to decide but it was powerful in its probative effect. It is absurd to even suggest, much less claim that the admissibility of such evidence can be determined by the jury's verdict after its exclusion. The argument that evidence is irrelevant because in its absence, the jury reached the opposite result is facetious at best.

In addition, Klockner misunderstands DOCS's claim in some of its contentions. For example, Klockner's characterization of the relevancy of the TAD failures is baseless.[25]

DOCS offered the evidence of failures in Ferrotubi pipe it bought from TAD for two primary reasons. The first was to show the latent manufacturing defect in the pipe. We have held the evidence admissible for that purpose. The second was to show who the seller of the pipe that failed was. DOCS asserts that two of the downhole failures occurred in Ferrotubi pipe that Klockner sold to DOCS; the other three occurred in Ferrotubi pipe that TAD sold to DOCS. DOCS may prove that Klockner sold the pipe which failed in a particular well by showing that TAD—the only other supplier DOCS used—did not.

### Evidence Concerning the Pipe Klockner Supplied

The trial court excluded evidence concerning the two failures in Ferrotubi mate-

---

400 ("safety of the system of manufacturing, testing and inspecting ... was the dominant issue in this case").

**22.** F.R.Evid. 403; *see also Ramos,* 615 F.2d at 340; *Jackson,* 788 F.2d at 1075.

**23.** Klockner is apparently asserting that if DOCS had explicitly referred to the evidence it wanted admitted as evidence of "similar" failures, the excluded evidence would have been admissible.

**24.** *See supra* text accompanying note 14.

**25.** Klockner poses the following hypothetical as analogous to DOCS's position:

A Plaintiff, injured in the rollover of an unidentified vehicle, could offer evidence of several Jeep rollover accidents to prove that the vehicle he was riding in at the time of the accident must have been a Jeep.

This is a poor analogy. First, we know the manufacturer of all the pipe—Ferrotubi. Second, we know that DOCS bought Ferrotubi pipe only from Klockner and TAD.

The hypothetical would be more analogous if worded as follows:

A Plaintiff, injured in the rollover of a Jeep it bought from Dealer X, could offer evidence of several rollover accidents in Jeeps sold by Dealer Y to prove that Jeeps are defective because they roll over frequently.

This contention is hardly startling.

rials which DOCS asserts were supplied by Klockner—the Crown Central and TOS failures. With regard to the Crown Central failure, DOCS offered a claim file containing documents tracing the pipe from the time DOCS ordered it to the well site. To authenticate the file as a business record, DOCS offered evidence that this file and the documents contained therein were prepared in the regular course of business and were of the type customarily kept and relied upon by people in the industry. Klockner objected on several grounds including relevancy, highlighting, and hearsay (with respect to a well log). The trial court excluded the entire file.[26]

The trial court's discretion in making evidentiary rulings is wide and overturned only where that discretion is abused or where plain error occurs. *Jackson*, 788 F.2d at 1075 (citations omitted). Here we do not even know which of Klockner's objections the trial court relied on in excluding the file. We know only that it was not admitted for general purposes or for the limited purpose of showing Klockner's knowledge of the problems and the reasonableness of its response. Since the case is to be retried, we need not rule on whether the court erred, although without more precise information as to why this file was excluded, we are unable to determine why the predicate was insufficient. But it is proper to emphasize that should this exhib-

it or its components be offered again and objected to again on remand, the trial judge should state exactly the objection being sustained or overruled.

■ The trial court also excluded a lab report which detailed the testing and analysis of the failed sections of pipe retrieved from TOS. Klockner objected to the report on the grounds that DOCS failed to lay a proper predicate for its admission. The rationale for the objection was that the chain of custody of the material tested was not proven. Any defects in the chain of custody go to the weight to be afforded the evidence, not its admissibility, and is thus reserved for the jury. *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1154 (5th Cir. 1981) (Citations omitted).[27]

### Improper Closing Argument

DOCS has challenged the propriety of several remarks made by Klockner's counsel in closing argument. In essence, DOCS alleges that Klockner argued the absence of evidence which it had excluded through its motion in limine and objections. Thus, according to DOCS, Klockner argued facts and inferences which it knew to be false.

Although DOCS's contentions may have merit, we need not reach this issue. On remand, DOCS will be allowed to introduce much of the evidence which was excluded

---

**26.** The trial court did not say which objection(s) he was sustaining. He had attempted to have counsel work out their evidentiary differences themselves by opining that his ruling would not be reversible.

There's another way you can go about it. You know, *very few evidentiary matters are subject to reversal in federal court*. It's a lot more broad and liberal than it is in state court.

Now this stuff coming in from somewhere else, if it hurts you, all right; then I'll sit down and go through it and this goes for both sides. But *if I find out that you're leaning strictly on technicalities, which in federal court you can gloss over, say no reversible error even though technically you may be correct,* then at that point I'm going to be under a full head of steam.

\* \* \* \* \* \*

But the question is *I'm not going to go through four pages of objections on a big, thick notebook.* I'm going to ask you to get around

that and if you can't work it out, then I'll rule, but I don't want to broadbrush this thing. After allowing counsel for both parties a few minutes to argue about the admissibility of the notebook, the trial judge concluded:

I'm ready to rule. I'm ready to rule. I sustain the objection. If you want to get it in piecemeal, fine, but you made the tender. Based upon the tender of that book, all I can say is sustain the objection.
Vol. 19, pp. 84–89 (Emphasis added).

**27.** Klockner argues that *Ballou* is not applicable because it was a criminal case dealing with a blood sample in which the blood donor was not disputed, but the handling of the blood once donated was in question. We recognize the distinction, but hold that the principle is nonetheless applicable to this case. Klockner, of course, will have every opportunity on remand to convince the jury that the report does not describe Ferrotubi pipe or pipe that Klockner sold to DOCS.

during the first trial. Klockner's argument will necessarily be different. Any impropriety which occurs on remand must be challenged and dealt with at that time.

### The Usury Questions

In a prior summary judgment, *see* discussion, *infra*, the trial court held DOCS liable to pay Klockner for certain 8⅝″ Ferrotubi pipe. At that time, the trial court left for trial of whether the contracts involved in that summary judgment were usurious. Fact questions remained to be decided by the jury.

Several questions arise regarding the trial court's determination that Klockner did not charge DOCS usury. The questions involve the trial court's choice of law determination, the effect of possibly conflicting jury answers to special interrogatories, and the trial court's denial of a new trial on this issue.

■ Because the UCC governs this case, the choice of law provisions contained in that Code must be applied. *Woods–Tucker Leasing Corp. of Georgia v. Hutcheson–Ingram Development Co.*, 642 F.2d 744, 748–49 (5th Cir.1981). Under the UCC, as in effect in Texas and New York,[28] the parties to a multistate transaction may choose the law which will govern their contract as long as the chosen law bears a "reasonable relation" to the transaction.[29]

The jury found that Klockner's sales contracts, issued in response to DOCS's purchase orders, were a part of the parties'

agreement.[30] Those contracts provided that New York law governed the transactions. Based on this factual finding, which DOCS does not challenge on appeal, the trial court was required to apply New York law unless it found that New York law bore no "reasonable relation" to the transaction. *See Woods–Tucker, supra*. The trial court made no such finding, nor could it on the record before it.[31]

■ New York law does not allow a defense of usury. N.Y. General Obligations Law § 5–521 (McKinney 1989). The New York courts do not allow corporations, foreign or domestic, to take affirmative action in their courts to avoid their obligations based on usury. *See Butterworth v. O'Brien*, 23 N.Y. 275 (1861); *MacQuoid v. Queens Estate*, 143 App.Div. 134, 127 N.Y.S. 867 (2d Dpt.1911); *Isle of Wight Co. v. Smith*, 51 Hun. 562, 4 N.Y.S. 73 (2d Dpt. 1889); *Southern Life Ins. & Trust Co. v. Packer*, 17 N.Y. 51 (1858).

Because DOCS has no usury defense under the applicable New York law, its remaining challenges to the trial court's rulings on usury are moot. Thus, we affirm the trial court's holding that Klockner prevails on the usury claim, albeit upon a different rationale.

### The Interlocutory Summary Judgment

■ On May 21, 1986, prior to the trial, the trial court granted Klockner's motion for summary judgment to the extent of holding DOCS liable for payment on 8⅝″ Ferrotubi material.[32]

---

**28.** Tex.Bus. & Com.Code Ann. § 1.105 (Vernon 1968); N.Y. Uniform Commercial Code § 1–105 (McKinney 1964).

**29.** The choice lacks a reasonable relation if it has no normal relation to the transaction. *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 408, 47 S.Ct. 626, 627, 71 L.Ed. 1123, 1127 (1927); *see also Woods–Tucker* at 749.

**30.** In particular, the jury found in interrogatories 21–25 and 27–31 that DOCS's purchase orders did not prohibit additional terms, that Klockner's sales contracts were a timely acceptance of DOCS's purchase orders, that the terms of Klockner's sales contracts did not materially alter the agreement, and that DOCS failed to object to any of the terms therein in a timely manner.

**31.** The record establishes New York's relation to the transactions. Klockner's principal place of business is in New York and its officers who negotiated with DOCS on payment and collection issues are in New York. DOCS's checks were countersigned by its officers who resided and maintained offices in New York. The transactions were also guaranteed by DOCS's New York parent company, Davidson Pipe Supply Co., Inc.

**32.** This is not the material involved in the trial which was 4½″ and 5½″ tubing, however, the same claims or similar claims were raised regarding all the various sizes.

The trial court found that DOCS had "failed to respond to the motion for pretrial summary judgment." The parties debate the meaning of this statement. DOCS asserts that the trial court erred because it had in fact responded and showed the existence of genuine issues of material fact. Klockner agrees that DOCS timely responded and that it filed a reply to DOCS's response. Klockner asserts that the trial court meant only that DOCS had not responded *adequately*.

We agree with DOCS that the trial court erred. The order mentions only a review of the pleadings along with Klockner's motion, not the additional response and reply. Further, the trial court focused on the F.R.Civ.P. 56(e) requirement that a party respond to a motion for summary judgment which has been supported by evidence with specific facts showing a genuine issue for trial. As the trial court stated "an adverse party may not rest upon the mere allegations or denials of its pleadings." The trial court followed this discussion of the rule directly with the statement that DOCS "has failed to respond." In the rest of the order, the trial court referred to positions taken by DOCS in its complaint and earlier pleadings. No mention was made by the trial judge of the specific responses and arguments raised in DOCS's response to the summary judgment motion.

We reverse the summary judgment. DOCS did respond and raise genuine issues of material fact in its response by asserting that there had been two failures in the 8⅝" material and that Klockner was on notice of them. DOCS is entitled to have the jury decide Klockner's liability on this issue.

### Conclusion

To briefly recapitulate our holdings:

(i) This case must be remanded for a new trial on the questions of product defect and Klockner's liability for breach of warranty and violation of the Texas DTPA. At this new trial, DOCS is entitled to present evidence of similar failures of Ferrotubi materials in order to show product defect. The trial court is instructed that flaws in the chain of custody of physical evidence go to its weight, not its admissibility.

(ii) We hold that pursuant to unchallenged jury findings, New York law governed the transactions and precludes DOCS's defense of usury. Thus we affirm the trial court's holding that DOCS take nothing by its usury claim.

(iii) Finally, the interlocutory summary judgment granted to Klockner regarding the 8⅝" Ferrotubi material is reversed. Genuine issues of material fact exist. DOCS is entitled to a jury's decision on liability and damages.

AFFIRMED IN PART, REVERSED AND REMANDED FOR NEW TRIAL IN PART.