Carl WEEKS, Plaintiff-Appellant,

v.

REMINGTON ARMS COMPANY, INC., Defendant-Appellee.

No. 83–8107.

United States Court of Appeals, Eleventh Circuit.

June 7, 1984.

Jack L. Cooper, Augusta, Ga., for plaintiff-appellant.

William C. Reed, Augusta, Ga., for defendant-appellee.

Before HILL, VANCE and ANDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The appeal in this diversity case presents three questions: (1) was appellant's strict liability claim barred by the ten-year limitation period of Georgia's Products Liability Act, Code Ga.Ann. § 51-1-11 (1982); (2) did the district court correctly direct a verdict in favor of appellee on appellant's negligence claims; and (3) was appellee required to produce files concerning other alleged failures of its product. We agree with the district court that the Georgia statute time-bars appellant's strict liability claim. However, we hold that the district court erred in granting appellee a directed verdict on the negligence counts and that, in any subsequent trial of this matter, appellant is entitled to appellee's files concerning other alleged failures of its product.

## I. BACKGROUND

Appellant Weeks was injured when his Remington shotgun discharged with its safety in the "on" position. He sued Remington and sought recovery under theories of strict liability and negligence. After conducting a pretrial hearing, the district court granted Remington's motion for summary judgment on the strict liability claim.

Weeks' negligence claims were tried before a jury, but the district court declared a mistrial when Weeks sought to introduce evidence that other Remington shotguns had misfired under similar circumstances. At the conclusion of all evidence in the second trial, the district court directed a verdict against Weeks on his negligence counts. The written order granting Remington a directed verdict stated no grounds for the ruling.

## II. THE STRICT LIABILITY CLAIM

The Remington shotgun that injured Weeks was manufactured in August of 1968 and sold to a retail store in May of 1969. Weeks purchased the gun in August or September of 1969. Weeks was injured when the gun misfired in October of 1979. From these undisputed facts, the district court concluded that Weeks' strict liability claim was barred by the ten-year limitation period imposed by Code Ga.Ann. § 51-1-11(b)(2) (1982). We agree.

In April of 1968, the state legislature approved the Georgia Products Liability Act. 1968 Ga.Laws 1166. Under the Act, any manufacturer of a product sold as new property could be held liable for injuries proximately caused by the product if, when sold, the product was "not merchantable and reasonably suited to the use intended ...." Code Ga.Ann. § 51-1-11(b)(1). The primary thrust of the Act is to impose strict liability on manufacturers whose "defective" products cause injury. *See Center Chemical Co. v. Parzini,* 234 Ga. 868, 869-70, 218 S.E.2d 580, 581-82 (1975).[1]

---

**1.** In order to make out a case of strict liability, an injured consumer must still prove that the

As originally enacted, Georgia's products liability statute placed no time limit on an injured consumer's strict liability claim against the product manufacturer. *Compare* Ga.Code Ann. § 105–106 (1968) *with* Code Ga.Ann. § 51–1–11 (1982). Thus, under the old law the maker of a product that causes injury forty or fifty years after its manufacture could be held strictly liable for that injury. Perhaps to alleviate the harshness of such a result, the Georgia Legislature amended the statute in 1978 to impose a ten-year limitation period on claims based on the Act. The amendment, which went into effect on July 1, 1978, *see* Code Ga.Ann. § 1–3–4 (1982), provides:

> No actions shall be commenced pursuant to this subsection with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury.

Code Ga.Ann. § 51–1–11(b)(2) (1982).[2]

Since Weeks commenced his products liability action more than ten years after he bought the gun, section 51–1–11(b)(2) bars his strict liability claim against Remington. In effect, Remington's exposure to strict liability claims based on Georgia's products liability statute expired ten years after Weeks bought the gun from the retail store that purchased the gun from Remington. After that time, section 51–1–11(b)(2) granted Remington "repose" from strict liability claims arising from this particular product.

Weeks disputes our application of section 51–1–11(b)(2) to the facts of this case. He argues that the ten-year limitation period cannot be applied to products sold *before* the Georgia Legislature added subsection (b)(2) to the Products Liability Act. To do so, Weeks contends, would violate the well-established principle of Georgia law that

statutes are not to be given "a retrospective operation, unless their language imperatively requires such construction." *Bussey v. Bishop*, 169 Ga. 251, 253, 150 S.E. 78, 79 (1929) (citation omitted); *see also* Code Ga.Ann. § 1–3–5 (1982).

Although we have discovered no Georgia decision applying subsection (b)(2) to a claim arising from a product that was sold as new property before subsection (b)(2) became effective, we are confident that the Georgia courts, if confronted with the question, would hold the provision applicable. The Georgia courts long ago rejected any notion that statutes could never be applied retrospectively. As the Georgia Supreme Court emphasized:

> [T]his court has definitively settled the law to be that our constitution forbids the passage of only those retroactive, or rather retrospective, laws which injuriously affect the vested rights of citizens. The general rule throughout the United States is that a State legislature may constitutionally repeal, alter, or modify state laws enacted under the police power for the protection of the public, without violating any express or implied constitutional prohibition against retroactive statutes. And the more especially is this true where no vested rights are disturbed.

*Bullard v. Holman*, 184 Ga. 788, 792, 193 S.E. 586, 588 (1937); *see also Smith v. Abercrombie*, 235 Ga. 741, 749, 221 S.E.2d 802, 809 (1975) (Georgia's "prohibition against retroactive laws applies to vested rights.") (citation omitted); *Armistead v. Cherokee County School District*, 144 Ga. App. 178, 179, 241 S.E.2d 19, 21 (1977), *cert. denied* ("The constitutional prohibition against retroactive laws applies only to

---

injury-causing product, when sold, was "defective." *See Center Chemical Co. v. Parzini*, 234 Ga. 868, 869–70, 218 S.E.2d 580, 581–82 (1975). The consumer is not required to prove negligence on the part of the manufacturer. *Id.*

**2.** Statutory limitation periods on products liability claims, such as the one expressed by section 51–1–11(b)(2), are generally known as "statutes of repose." *See* McGovern, *Symposium Products Liability: The Variety, Policy and Constitu-*

*tionality of Products Liability Statutes of Repose*, 30 Am.U.L.Rev. 579, 584 (1981). Professor McGovern explains that a statute of repose, unlike the typical statute of limitation, begins to run at the time the product is manufactured or sold and thus allows the manufacturer "repose" from strict liability at the expiration of the designated period. *Id.* at 584–86; *see also* Martin, *A Statute of Repose for Product Liability Claims*, 50 Fordham L.Rev. 745, 749 (1982).

those laws which affect or impair vested rights.") (citations omitted).

Adhering to the distinctions drawn by the cases cited above, the Georgia courts have determined that its rule against applying statutes retrospectively does not control where the cause of action has not accrued or vested at the time the statute became operative. *U–Haul Co. v. Abreu & Robeson, Inc.,* 156 Ga.App. 72, 73, 274 S.E.2d 26, 27 (1980), *aff'd on other grounds,* 247 Ga. 565, 277 S.E.2d 497 (1981). Conversely, the rule prohibiting the retrospective operation of statutes forbids the application of a statutory limitation period to a cause of action that accrued before the statute went into effect. *Jaro, Inc. v. Shields,* 123 Ga.App. 391, 181 S.E.2d 110 (1971); *see U–Haul Co. v. Abreu & Robeson, Inc.,* 156 Ga.App. at 73, 274 S.E.2d at 27.

█ In this case, Weeks had no strict liability claim against Remington at the time the statutory limitation period was added to Georgia's Products Liability Act. Subsection (b)(2) went into effect on July 1, 1978. Weeks was injured several months later, in October of 1978. Applying the statutory limitation period does not affect any "accrued or vested right" that Weeks might have in bringing an action against Remington. Therefore, the district court correctly determined that Weeks' strict liability claim is time-barred by Code Ga.Ann. §§ 51–1–11(b)(2).[3]

---

3. Weeks also argues that, regardless of whether vested interests are impaired, no Georgia statute can be given retrospective operation unless the Georgia Legislature expresses its intention to classify those affected by the statute differently. He contends that subsection (b)(2) places him in a "separate classification" from those who purchased Remington shotguns later in the ten-year interval between July of 1968, when the Act became effective, and July of 1978, when the limitation period was added.

Weeks' reasoning is specious. The ten-year limitation on strict liability claims will *always* "benefit" those who purchased an injury-producing item later in any given ten-year interval. This is so because the statute runs from the time the product is sold as new property. Thus, a consumer who buys product X later than a second consumer will not have his strict liability claim time-barred as early as the second consumer will. Just the same, both consumers

## III. THE NEGLIGENCE CLAIMS

Weeks testified that he was dove hunting with a friend on the day of the accident. After firing at a bird, Weeks decided to adjust his shotgun's polychoke, a device that modifies its firing pattern. He returned to the blind, put the gun's safety in the "on" position, and began to tighten the polychoke. In order to make such an adjustment, Weeks placed the gun on the grass near his position in the blind and reached for the barrel of the gun. As he grasped the end of the barrel, the gun discharged, seriously injuring Weeks' left hand.

Skip Baker, Weeks' hunting companion on the day of the accident, verified Weeks' account of the accident, including Weeks' statement that he put the safety on before making adjustments to the polychoke. Baker also testified that, after taking Weeks to the hospital, he unloaded Weeks' shotgun and noticed that the safety was on. Larry Weeks, appellant's brother, testified that he went to the hospital immediately after appellant had been admitted and that he, too, noticed that the safety was on.

In order to establish that the shotgun could fire with the safety on, Weeks called a gun expert who testified that the Remington's safety mechanism was inadequate because it was designed to lock the trigger, not the sear or the hammer. As the gun was designed to operate, pulling back on

are allowed ten years within which to bring such an action.

If anything, Weeks' argument illustrates why subsection (b)(2) must apply to products sold before the statute was amended. Under Weeks' theory, product manufacturers would be placed in "separate classifications" according to the time their product was sold. Three "classifications" would prevail: (1) manufacturers with *no* exposure to strict liability claims because their product was sold before July of 1968, *Wansor v. George Hantscho Co.,* 243 Ga. 91, 252 S.E.2d 623 (1979); (2) manufacturers with a *ten-year* period of exposure because their product was sold after July of 1978; and (3) manufacturers with an *unlimited* period of exposure because their product was sold after July of 1968 but before July of 1978. We find it difficult to believe that the Georgia Legislature intended to create such an anomalous classification of product manufacturers.

the trigger pushed the sear forward, thus releasing the hammer and causing the gun to fire. However, Weeks' expert testified that if debris got into the gun, the debris could force the sear away from the hammer and allow the hammer to fall without anyone's having moved the trigger. Debris might also block the trigger from returning to its normal position, after being pulled, thus preventing the safety from locking the partially pulled trigger and allowing the gun, if jolted, to fire. Because Remington's safety only prevented the trigger from being pulled, it did not keep the gun from firing if other forces—*e.g.,* debris or impact—moved the sear.[4] Using a cutaway model of the Remington shotgun, the expert demonstrated how debris might cause the gun to discharge with the safety on.

Weeks attempted to establish that Remington had reason to know of the inadequacy of the safety mechanism in two ways. First, he sought to discover from Remington its records relating to other alleged misfirings of the Remington shotgun.[5] Second, Weeks introduced several patents obtained by Remington for the safety mechanism installed on other models of its shotgun. The patents recounted the dangers inherent in a safety that did not lock both the trigger and the hammer and described a mechanism that was designed to block the sear.

As proof that the problem could be corrected, Weeks' expert illustrated other safety mechanisms that were designed to overcome the inadequacy of the Remington safety. One such mechanism, used by various models of the Winchester shotgun, locked the hammer as well as the trigger; and, although Remington disputed this testimony, the expert opined that debris would not cause the Winchester model to misfire under similar conditions.

Taking all the evidence in the light most favorable to Weeks and drawing all reasonable inferences from that evidence in his favor, *see Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), we conclude that he made out a case of negligent design sufficient for submission to the jury. Based on the evidence, a jury might have reasonably found that Remington had a duty to design a safety mechanism which would protect others from unreasonable risks of harm, that Remington breached its duty by employing this particular safety, and that the negligently designed safety proximately caused Weeks' injury. *See Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982). The evidence was sufficient to permit reasonable jurors to find Remington negligent in designing a safety which, even if engaged, would not prevent the gun from firing.

Remington argues that Weeks failed to establish a defect in the design of the safety mechanism. The inadequacy of Weeks' proof, Remington contends, lies in the fact that no debris was found in the gun's firing mechanism; therefore, Weeks' expert posed a theory to explain the misfiring, but the evidence did not support the offered explanation. Apparently, the district court directed a verdict because it agreed that Weeks had not shown a defect. *See* Record on Appeal at 448.

Weeks' expert, however, explained that the gun could have discharged any debris from the firing mechanism when it accidently fired with the safety on. We cannot say that such an inference is unreasonable

---

**4.** In reality, then, the alleged defect did not lie in the safety mechanism itself because this particular safety was only designed to immobilize the trigger. Weeks does not allege that the safety failed to lock the trigger. Rather, the alleged defect consists of the insufficiency of the safety system designed by Remington. In other words, the gun can fire with the safety on, or with the safety off but without pulling the trigger, because the sear and hammer can be made to operate independently of the trigger. For this reason, it seems inaccurate to characterize the safety itself as defective. It is perhaps more correct to say that the gun's safety features are defectively designed, if defective at all, because users are led to believe that the gun will not fire with the safety on, when in fact such is not the case.

**5.** The district court declared a mistrial when Weeks first attempted to elicit this information from one of Remington's witnesses. *See* part III, *infra.*

or that no fair-minded jury could conclude that the explanation was reasonable under the circumstances. Certainly, an impact sufficient to propel the weapon's shot with great force over any distance could reasonably be found to have dislodged debris from the gun's firing mechanism.

■ Remington also urges us to affirm the directed verdict on the grounds that Weeks was contributorily negligent in placing his finger over the open end of the shotgun and that, as a matter of law, his contributory negligence barred recovery.[6] However, the Georgia courts have made clear that,

> As a general proposition issue of negligence, contributory negligence and lack of ordinary care for one's own safety are not susceptible of summary adjudication either for or against the claimant, but should be resolved by trial in the ordinary manner. *Wakefield v. A.R. Winter Co.*, 121 Ga.App. 259, 260 (174 SE2d 178) (1970). The trial court can conclude as a matter of law that the facts do or do not show negligence on the part of the defendant or the plaintiff only where the evidence is plain, palpable and undisputable. *Powell v. Berry*, 145 Ga. 696, 701 (89 SE 753) (1916). "Even where there is no dispute as to the facts, it is however, usually for the jury to say whether the conduct in question met the standard of the reasonable man." *Wakefield v. A.R. Winter Co., supra.* See also *McCurry v. Bailey*, 224 Ga. 318, 162 S.E.2d 9 (1968); *Wynne v. Southern Bell Tel. Co.*, 159 Ga. 623, 126 S.E. 388 (1925).

*Ellington v. Tolar Construction Co.*, 237 Ga. 235, 237, 227 S.E.2d 336, 338–39 (1976).

■ On the record before this court, it is not "plain, palpable and undisputable" that Weeks was contributorily negligent. He testified that he reached for the shotgun to adjust the polychoke and that, after he grabbed the gun, it suddenly fired. On cross-examination, Weeks did admit that his finger might have slid over the open end of the barrel, but he also stated that he had to hold the top of the gun in order to adjust the polychoke. Finally, Weeks testified that he was unaware of the potential danger of the gun firing with the safety on; he set the safety and relied on it to prevent the gun from discharging while he adjusted the polychoke. Whether Weeks, by his conduct, failed to exercise ordinary care was a question for the jury to answer on proper instruction.

Similarly, a jury might have found Remington negligent in failing to warn users of its shotgun of the risk that the gun would discharge with the safety on. In order to go to the jury on this claim, Weeks was required to put on evidence from which reasonable jurors could find that Remington placed an item in commerce which, under foreseeable conditions, was likely to cause injury but failed to warn prospective purchasers of the danger. *See Evershine Products, Inc. v. Schmitt*, 130 Ga.App. 34, 37, 202 S.E.2d 228, 232 (1973). Remington's patent applications provided evidence of the foreseeability of the defect. If accepted by the jury, the patent applications would have established that Remington knew its gun would fire with the safety engaged. A reasonable jury could have found that Remington, possessing such knowledge, breached its duty to warn prospective users of the problem.[7] Therefore, the district court erred in directing a verdict on both of Weeks' negligence counts.

## IV. RECORDS OF SIMILAR FAILURES

During discovery, Weeks served interrogatories on Remington in an effort to learn about any other instances where one

---

**6.** Our review of an order granting a directed verdict is not confined to the grounds relied on by the district court. We will affirm if the district court can be sustained on any grounds. *Bickford v. International Speedway Corp.*, 654 F.2d 1028, 1031 (5th Cir.1981).

**7.** In light of our holding in part III, *infra*, that Weeks was entitled to Remington's records of other alleged failures of its safety mechanism, we see no reason to extend our discussion of the failure to warn issue any further. We expect that, given Remington's files, Weeks will present any additional evidence, disclosed by such files, of Remington's knowledge of this potential danger and, therefore, that any subsequent trial of this matter will take a somewhat different course.

of its shotguns fired with the safety on. Remington responded by citing eight other alleged failures of the safety mechanism. Weeks then served Remington with a request to produce its files on the other accidents. Remington objected to the request for production but turned the documents over to the district court for an *in camera* inspection. Although the parties dispute the nature of the court's ruling after the inspection,[8] it is clear that the court did not permit Weeks to inspect the files and granted a mistrial when Weeks asked a Remington official about the existence of other accidents involving similar failures of the safety.[9] The files remained sealed and in the possession of the district court during the subsequent trial.

In this appeal, Remington does not seriously dispute the admissibility of its records concerning other failures of its safety mechanism; nor could it. The relevancy of similar accident evidence has been firmly established in this circuit:

> Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation.

*Ramos v. Liberty Mutual Insurance Co.*, 615 F.2d 334, 338–39 (5th Cir.1980) (citations omitted), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981). Too, such evidence might be used to disprove a defendant's alternative theory of causation. *See Dollar v. Long Mfg., N.C., Inc.,* 561

F.2d 613, 617 (5th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).[10]

Of course, Rule 403 restricts the admissibility of otherwise relevant evidence under certain circumstances:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. Because of the potential impact that evidence of similar accidents can have on juries, this court has placed two additional limitations on the use of such evidence: (1) the prior failure(s) must have occurred under conditions substantially similar to those existing during the failure in question, and (2) the prior failure(s) must have occurred at a time that is not too remote from the time of the failure in question. *Ramos v. Liberty Mutual Insurance Co.,* 615 F.2d at 339 (*quoting Jones & Laughlin Steel Corp. v. Matherne,* 348 F.2d 394, 400 (5th Cir.1965)).[11]

■ In this case, Weeks was allowed no opportunity to establish substantial similarity of conditions because the district court refused to grant him access to Remington's records.[12] The same applies to the proximity in time limitation. His only attempt to establish the existence of the other accidents prompted a mistrial and an assessment of costs. We hold, that under these circumstances, the district court abused its

---

**8.** Weeks says that the court ruled the evidence admissible for impeachment purposes only. Remington says that the court only required Weeks to make an initial showing of similarity (between the extrinsic accident and the one in the case) before the court would allow Weeks to introduce the evidence from Remington's files. In light of our resolution of the issue, we see no need to resolve this dispute.

**9.** The court also ruled that Weeks would be assessed with costs if a mistrial were granted. Record on Appeal at 288.

**10.** At oral argument, Remington questioned whether evidence of *subsequent* failures was nonetheless properly denied Weeks. We note

that this circuit has previously held evidence of subsequent accidents relevant to the issue of causation. *See Dollar v. Long Mfg. N.C., Inc.,* 561 F.2d at 617.

**11.** In addition to the special limitations on the use of similar accident evidence discussed above, Rule 403 allows the district court discretion to exclude such evidence if its admission would unfairly surprise the defendant or confuse the issues. *See Ramos v. Liberty Mutual Insurance Co.,* 615 F.2d at 339.

**12.** Weeks did show that the prior failures involved firings with the safety on. We are not certain what else might have been required of him.

discretion by refusing Weeks access to Remington's files. In any subsequent trial of this matter, Weeks is entitled to Remington's records of other similar failures by its safety mechanism.[13]

AFFIRMED in part; REVERSED in part; and REMANDED.

13. The admissibility of those records can only be determined after Weeks is allowed an opportunity to establish similarity of conditions and proximity in time. We do not hold that the files should be admitted; we only hold that Weeks is entitled to those files and an opportunity to establish their admissibility.

By holding that Remington's files are subject to discovery, we do not suggest that such discovery cannot be controlled by the district court. Improper "snooping" by one plaintiff's attorney into Remington's files of materials gathered in other litigated or potentially litigated cases can result in misuse and the district court retains the discretion to control such misuse. The discovery to which we find Weeks entitled should be sufficiently circumscribed that neither Weeks nor his attorney can pass along to other plaintiffs' counsel information not subject to discovery in other litigation against Remington.