## COMPANHIA ENERGETICA POTIGUAR, Plaintiff,

v.

## CATERPILLAR INC., Caterpillar Americas Services Co. and Caterpillar Americas Co., Defendants.

### Case No. 14–CV–24277.

United States District Court, S.D. Florida.

Signed May 21, 2015.

---

Jessie F. Beeber, Patrick J. Boyle, Venable, LLP, New York, NY, for Plaintiff.

Kimberly A. Cook, Sedgwick, LLP, Miami, FL, for Defendant.

### ORDER ON PLAINTIFF'S DISCOVERY REQUEST

JONATHAN GOODMAN, United States Magistrate Judge.

The iconic television sitcom, "The Andy Griffith Show," which originally ran on CBS from 1960 to 1968, opened with Andy Griffith, playing Andy Taylor, sheriff of Mayberry, strolling down a country path with his son, Opie, played by Ron Howard (called "Ronny" Howard in the opening credits). With fishing rods slung over their shoulders, the two would saunter down the road, while the infectious, whistling-filled song, "The Fish'n Hole," would play. Called by at least one source as the number one fishing song of all-time,[1] the tune contained the following lyrics: "Well, now, take down your fishin' pole and meet me at the Fishin' Hole, We may not get a bite all day, but don't you rush away."

This television-based, Norman Rockwell mental image and the associated song lyrics come to mind (and find their way into this Order) because the subject of fishing often arises in discovery disputes, as parties objecting to discovery often brand the challenged requests as a "fishing expedition." This case is no exception, and Defendants have argued that the broader relevancy standard for discovery, as opposed to admissibility, should not be "misapplied" here to permit

---

**1.** *See* Outdoor Life, The Best Fishing Songs of All Time (listing what it considers to be the top 15 best fishing songs of all time).

622

"fishing expeditions in discovery." [ECF No. 83, p. 3].

But virtually *all* discovery involves at least *some* degree of fishing. That's the very nature of discovery. So calling a discovery request a fishing expedition does not usually provide a definitive way for the Undersigned to decide whether the discovery is permissible. In fact, other courts have recognized that the more-significant questions are to determine "[t]he pond, the type of lure, and how long the parties can leave their lines in the water." *Myers v. The Prudential Ins. Co.*, 581 F.Supp.2d 904, 913 (E.D.Tenn.2008) (also explaining that "much of discovery is a fishing expedition of sorts").[2]

In the instant case, for the reasons outlined below, the Undersigned concludes that the document request at issue is not an effort to sail off into deep discovery waters with overly broad nets which have not been shown to likely snag a catch of relevant documents. Plaintiff may obtain the disputed discovery even if it does involve a bit of fishing.

Plaintiff's lawsuit against diesel engine manufacturing entities concerns 144 allegedly defective generator sets ("gensets") (a generator driven by an engine mounted to a common platform) purchased to generate electricity for Brazilian power plants. The discovery dispute here is whether Caterpillar C32 engines used in *other* applications, such as industrial, marine, and machine scenarios and involving diverse products such as wood chippers, snow blowers, and locomotives, are similar enough to permit Plaintiff to obtain discovery about complaints, recalls, analyses, and tests concerning these same Caterpillar C32 engines used in applications other than those for power generators.

Complying with an Order entered after a discovery hearing, Defendant Caterpillar Inc. and other Defendants (Caterpillar Americas Service Co. and Caterpillar Americas Co., collectively "Caterpillar") submitted an affidavit from Michael Minks, Caterpillar's customer service engineer (for, among other products, the C32 diesel engine operating in industrial, electric power and machine operations). Plaintiff Companhia Energetica Potiguar ("CEP") took Mink's deposition and then submitted the affidavit of John Stanley Poulson, a marine engineer and surveyor who CEP retained as an expert witness.

In his affidavit, Minks explains what he considers to be the significant **differences** between C32 engines used in electric power applications and other applications which Caterpillar supports. [ECF No. 68]. But, not surprisingly, Poulson reaches a different conclusion in his affidavit. [ECF No. 74]. Poulson says that (1) the core parts of the C32 diesel engine are substantially similar across all applications, (2) the core engine parts are actually identical in many instances, (3) the same parts have failed in different applications for the same root cause, and (4) he believes the failures he observed in the engines which failed in this case have probably been experienced by C32 diesel engines in other applications.

---

2. "[T]he purpose of discovery is to allow a broad search for facts ... or any other matters which may aid a party in the preparation or presentation of his case," and, while subject to relevance, undue burden, overbreadth, and privilege limitations, "the Rules ... permit fishing for evidence as they should." *AIG Centennial Ins. Co. v. O'Neill*, No. 09–60551–CIV, 2010 WL 4116555, at *3 (S.D.Fla. Oct. 18, 2010) (internal citations omitted).

Indeed, Judge Robin Rosenbaum, now a circuit court appellate judge, noted in *AIG Centennial Ins. Co.* that the Advisory Committee Notes to the 1947 Amendment cite favorably to a case for the notion that a fishing-for-evidence approach supports the view that discovery may be relevant even if not admissible at trial.

For an additional fishing analogy concerning discovery, see *Eli Lilly & Co. v. InvaGen Pharm., Inc.*, No. 09–cv–87–DFH–TAB, 2009 WL 3018744, at *1 (S.D.Ind. Sept. 17, 2009) (acknowledging fishing metaphor for discovery and describing one party as "want[ing] to sail a trawler through the Atlantic Ocean" and explaining that the opposing party wants to permit only a visit "to a fishing hole for five minutes with a plastic worm."). *See generally Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir.1998) (magistrate judge's order limiting plaintiff's ability to take depositions of two senior officers of defendant's corporate parent to two hours properly balanced a right to discovery against the need to prevent fishing expeditions); *cf. Harco Nat. Ins. Co. v. Sleegers Eng'g, Inc.*, No. 06–cv–11314, 2014 WL 5421237 (E.D.Mich. Oct. 22, 2014) ("[t]o determine the proper scope of discovery, a district court should balance a party's right to discovery with the need to prevent fishing expeditions.") (internal citations omitted).

But Caterpillar notes that the applications cover a huge array of different products, and it contends that there are substantial differences between them.

In addition to submitting affidavits, the parties each submitted a memorandum of law [ECF Nos. 80; 83]. Among other arguments it advanced, Caterpillar challenges Poulson's conclusions as being vague and conclusory, and it argues that he never demonstrated *why* failures in similar components in entirely different products will help CEP in proving that the gensets were incapable of continuous operation, which is the gravamen of each of CEP's causes of action. CEP, however, brands Caterpillar's position as unjustifiable. In fact, it argues that Caterpillar's objection is so legally weak that it should be compelled to pay costs and attorney's fees under Federal Rule of Civil Procedure 37's "loser pays" presumption for discovery disputes (because its objection is not substantially justified).

The Undersigned has reviewed the affidavits, the memoranda, the exhibits, the discovery hearing transcript and the case law cited by the parties. Although Caterpillar has already provided substantial discovery about its C32 engines in the power generation application, I nonetheless find that there is sufficient similarity between the different applications (because of the core iron parts shared in common among all applications) to permit the requested discovery.

In reaching this conclusion, I recognize that Caterpillar contends that Poulson did not explain **why** he concluded that "I believe that the failures I have seen in CEP's C32 Diesel Engines have probably been experienced by C32 Diesel Engines in other applications." [ECF No. 74, p. 9]. Moreover, I appreciate Caterpillar's point that he did not focus his opinions on the specific defect alleged here—that the engines would not operate in a continuous mode. Thus, Caterpillar argues, the mere fact that a C32 engine failed in, for example, a boat engine would not necessarily have any bearing on whether that failure involved a failure to operate continuously in a power generation application.

On the other hand, Caterpillar's own expert, Minks, testified that (1) the core parts

of the C32 engine **are** substantially similar in all C32 engines, regardless of application, (2) the core engine parts have failed across *all* applications, (3) a manufacturing or design defect in any such part could cause such a failure across applications (and probably has), and (4) a search for such information would take approximately 15 or 20 seconds and would yield a mountain of evidence.

Given the broad discovery rule and the critical fact that the same engine with the same core parts is at issue in the discovery request, the discovery is permissible.

But Caterpillar's position, though ultimately unsuccessful, is certainly substantially justified, and I therefore will not grant CEP's request to award attorney's fees and costs against Caterpillar.

This ruling relates only to discovery. It does not mean that CEP can use the discovery it will obtain about the engine's problems in other applications at trial, nor does it mean that CEP can use the information for purposes other than discovery, such as seeking or defending summary judgment. This is a discovery-only ruling, based on the specific, broad and comparatively liberal rules governing discovery.

The Undersigned will outline below a more-detailed summary of the relevant factual background and a more-complete legal analysis.

*Factual Background*

According to the allegations of the Complaint, CEP's predecessor-in-interest, Termoeletrica Potiguar S/A ("TEP"), purchased 144 Caterpillar C32 diesel engines to run a power plant supplying electricity to the Brazilian public. Both before and after the purchase, Caterpillar represented numerous times that the diesel engines were fit for that purpose and could generate a specific amount of electricity continuously. But CEP contends that the 144 engines have been plagued with breakdowns, malfunctions and recalls from the beginning, resulting in the total failure of more than 55 engines, more than 20 of which have exploded.

CEP's Complaint alleges fraud, negligent representation, promissory estoppel, breach

of express and implied warranties, strict product liability, unfair trade practices and revocation of acceptance.

Despite the myriad causes of action, the primary (but not the sole) focus of the lawsuit is the overarching allegation that the generators were capable of continuous operation—"namely, to each generate 830 ekW or 1037 kVA of power continuously, that is 'without varying load for an unlimited time.' " [ECF No. 1, ¶ 2]. The claims also emphasize the failure to operate continuously. For example, paragraph 149, entitled "Defendants' False Representations Continue to this Day," asserts the following allegation: "One of the most shocking things about Defendants' conduct is that, even with all of the knowledge they have about the serious defects in the CAT C32 generator sets, including that the CAT C32s are utterly incapable of **operating continuously** at the power rating specified, Defendants to this day continue to represent on their website, and elsewhere, that CAT C32 generator sets are capable of functioning in **continuous mode** at 830 ekW or 1037 kVA." (emphasis supplied).

Likewise, the fraud and negligent representation allegations also stress the purportedly misleading representation that the gensets "could operate continuously." Indeed, 7 of the 8 counts all emphasize the notion that Defendants represented that the engines could operate continuously.

On January 16, 2015, CEP served its first request for production to Caterpillar, including requests for documents relating to all C32 diesel engines on several topics, including inquiries, complaints, updates, recalls, analyses, and tests, regardless of application. Caterpillar objected to producing any documents other than those relating to the specific 144 engines sold to TEP.

Shortly before an April 10, 2015 discovery hearing on this dispute, Caterpillar agreed to produce documents concerning other C32 diesel engines in power generation applications, but not in other applications, such as marine or industrial. At the hearing, CEP argued that the documents are discoverable because they relate to substantially similar situations involving the same engine; Caterpillar urged the opposite. Confronted with this technical-type dispute, the Undersigned ordered the submission of evidence, the taking of a deposition and legal briefing on the question of "whether C32 engines used in other applications (non-power-generation applications) are substantially similar [to] C32 engines used in power generation applications." [ECF No. 65]. The parties complied with the order; they submitted affidavits, took evidence and submitted memoranda.

According to Caterpillar's response [ECF No. 83], it produced to CEP 23,441 pages of warranty claim detail, representing approximately 13,000 claims, concerning C32 diesel engines used in *electric power applications* from 2006 to the present. In addition, it advised that 13,239 pages of Dealer Service Network records, representing approximately 3,600 reports, were produced (using the same parameters).

Poulson, CEP's expert, has broad experience in diesel engine design, operation and maintenance. He has experience with Caterpillar engine failures and in determining the cause of those failures. CEP retained him to conduct a forensic analysis of the cause of the failures of the C32 engines in order to reach an opinion as to why so many of the engines malfunctioned and failed in more than 20 instances and why crankcase explosions occurred in several instances. He made two site visits to CEP to inspect, photograph and analyze the failed C32 engines on CEP's premises.

Poulson and/or others working under his direction reviewed and analyzed the documents produced to date by the parties. He also reviewed Minks' affidavit, attended Minks' deposition and reviewed the transcript.

In his affidavit, Poulson explained that the core engine parts of C32 engines are "substantially similar, if not the same, across all applications." He noted that Caterpillar manufactures all of its C32 engines in the same Georgia facility, regardless of their intended application. Although Minks testified that the C32 diesel engine has tens of thousands of parts, the core engine parts, also called the "core iron," include the crankshaft, cylinder block, cylinder heads, connecting

rods, main bearings and connecting rod bearings.

Poulson's inspection of the C32 engines at issue in this lawsuit revealed that all of the major engine failures involved these core engine parts. Moreover, Poulson explained that his own investigation revealed that these same core iron engine parts are actually identical in many C32 applications, even when used in different applications. He further noted that his online search for Caterpillar spare parts confirms the point that core parts for the C32 engine remain the same across applications. His affidavit provides several examples of this, where the same part number is used even though the part is used for engines put in different applications.

Focusing on representations made in Minks' affidavit, Poulson noted that Minks later gave deposition testimony that the core engine parts of a SYC prefix C32 engine used in electric power applications are "similar" to those parts using a Marine RPM prefix and at most have only "subtle" differences.

Significantly, Poulson's affidavit also emphasized that Minks testified (in his deposition) that core engine parts are substantially similar in all C32 diesel engines, regardless of application. In addition, Poulson underscored the portion of Minks' deposition testimony where he explained that parts can fail, for the same root cause, in C32 engines across applications. For example, Minks explained (and Poulson noted), this may occur where there is a design or manufacturing defect in the part.

Indeed, Poulson stressed the fact that Minks himself acknowledged that certain parts "operate the exact same way in every application. So if there was ... a design or manufacturing defect—you would expect to see that same failure mode in all applications." (emphasis supplied) [ECF No. 74–3, p. 159].

According to Poulson, it is especially significant that Minks confirmed that CEP's own engines (i.e., the ones manufactured by Caterpillar and which allegedly failed in this very case) are an example of a defect common across all applications. Specifically, Poulson mentioned a piston design defect affecting all C32 engines across all applications. Minks confirmed that the piston failure was not limited to C32 engines in the electrical power application, but was caused by a "design defect" that occurred "through multiple applications," and for "every C32 engine." Minks noted a similar "failure-across-all-applications" scenario involving fuel line failures.

In his affidavit, Poulson distinguished some of the major points Minks made in his affidavit. For example, Minks explained that C32 engines in different applications run with different load factors, engine speeds, ratings and emissions. However, Poulson noted that these differences do not change the fundamental fact that the core parts are substantially similar, if not identical. Thus, "the same failure of these parts can occur in C32 Diesel Engines regardless of the application in which they are being used." In other words, "[a]ltering the C32 Diesel Engine's speed, emissions or load factor does not transform it into a different product altogether." [ECF No. 74, p. 7].

Poulson further noted that C32 engines can be repurposed from one application to another through reprogramming of its parameters—a development he says "makes evident that effectively the same engine is used for different applications." [ECF No. 74, p. 9].

Poulson's affidavit, however, concedes that different applications may affect C32 diesel engines differently because of the differences in load factors. Nevertheless, he also says that "the same C32 Diesel Engine parts have failed in different applications for the same root cause, including a design or manufacturing defect." He concludes by saying that "I believe that the failures I have seen in CEP's C32 Diesel Engines have probably been experienced by C32 Diesel Engines in other applications." [ECF No. 74, p. 9].

To provide another contrasting point, Minks explained that electric power is the only application in which *continuous* rating is available. He also gave examples of a wide assortment of machines which used the engine—such as tub grinders, frac trailers,

snow blowers, off-highway trucks, bulldozers, yachts and wood chippers.

In his deposition, Minks explained that C32 engines used in applications other than electric power generation are so different that analyzing the failures of the core engine parts in different products is like "comparing apples to oranges." [ECF No. 83–3, p. 118].

Although CEP stressed the similarity of the core iron parts in engines used in different applications, Minks pointed out that adding or removing certain parts would result in a different C32 engine. For example, transforming a C32 genset engine into a marine engine would require the addition and removal of parts. His affidavit included a chart outlining the differences in parts for this type of transformation, and the differing parts include fuel lines, water lines, heat shields, manifolds, plugs, wiring, dampers, fasteners, exchangers and other parts.

In his deposition, Minks provided information about the different conditions which exist when the engine is run in various applications. He compared a truck engine and a locomotive engine. Because a truck is often covered in mud, there is a significant opportunity for contamination. When parts are contaminated and not properly serviced, they will ultimately fail, causing other parts to fail. But a locomotive engine runs in a comparatively clean environment and would not necessarily confront the same type of contamination issues. [ECF No. 83–3, p. 109].

Minks compared a genset to a truck, and he noted that a genset operates in a steady state at 1800 rpm for 60 hertz, while a truck operates from idle up to 1800 rpm. According to Minks, these differences are significant because they mean a valve would open two to three times more frequently in one application than in another. This difference "allows for more wear opportunity." [ECF No. 83–3, pp. 107–08].

Significantly, Minks explained that "each application offers its own opportunities for applying stress to any given component." Without an understanding of the application, Minks said, "it's really a struggle to come to the correct root cause." [ECF No. 83–3, pp. 112–13]. Thus, if load factor among different

applications were to be evaluated, then it would be possible to "see why a part would fail in one application and not another." [ECF No. 83–3, pp. 112–13]. Minks emphasized that the rating and amount of mechanical load factor would be the most significant points—but those factors are not substantially similar across applications. As summarized by Minks in his depositions, "depending on which application of industrial you grab ahold of, you could be dissimilar to an EP [electric power] continuous operation. But industrial is kind of a very broad application in itself." [ECF No. 83–3, pp. 112–13].

### The Parties' Contentions

CEP contends that the "substantial similarity" rule governs only the admissibility of evidence at trial and is inapplicable to discovery matters; Caterpillar disagrees.

CEP contends that Caterpillar, as the party resisting discovery, has the burden to demonstrate how the request is unreasonable or not relevant; Caterpillar says that CEP has the burden of first making a threshold showing of relevance and that discovery about similar models in product liability cases is permissible only if the occurrences are substantially similar. Therefore, Caterpillar further contends, CEP has the burden to establish that the different applications are substantially similar to the power generation application.

Moving on from the procedural to the substantive, CEP argues that it has demonstrated substantial similarity among applications, while Caterpillar takes the contrary position.

### Legal Analysis

A district court has broad discretion under Rule 26 of the Federal Rules of Civil Procedure to compel or deny discovery; appellate courts therefore review such rulings for an abuse of discretion. *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292, 1306 (11th Cir.2011). "Discretion means the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Id.* (quotation omitted). Accordingly, a district court's discovery ruling will not be set

aside unless the court has made a clear error of judgment or has applied the wrong legal standard. *Id.* at 1307. Even then, relief will not be granted unless the appealing party has shown that the denial of discovery resulted in substantial harm to his case. *Id.*

■ "The Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Farnsworth v. Procter & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir.1985). Rule 26(b) therefore permits a party to obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense...." Fed.R.Civ.P. 26(b). "The Courts have long held that relevance for discovery purposes is much broader than relevance for trial purposes," and as such "[d]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the subject matter of the action." *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc.,* No. 01–0392–CIV–GOLD, 2001 WL 34079319, at *2 (S.D.Fla. Nov. 1, 2001) (emphasis added) (citations omitted).

United States Magistrate Judge Linnea Johnson summarized the rules underlying the comparatively broad scope of discovery in *Donahay v. Palm Beach Tours & Trans., Inc.,* 242 F.R.D. 685, 687 (S.D.Fla.2007):

> Information is relevant if it is "germane, conceivably helpful to plaintiff, or reasonably calculated to lead to admissible evidence." *Parsons v. General Motors Corp.,* 85 F.R.D. 724 (N.D.Ga.1980). *See also Hickman* [*v. Taylor*], 329 U.S. [495] at 501, 67 S.Ct. 385 [91 L.Ed. 451 (1947)]. Thus, under Rule 26 relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 352, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." *Id.* at 352, 98 S.Ct. 2380. In short, information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States,* 502 F.2d 506 (5th Cir. 1974).

There are cases, including orders entered by the Undersigned, which stand for the rule that the party resisting discovery usually has the initial burden to specifically explain why its objections, including those based on irrelevance, are proper—but that the offering party bears the burden of demonstrating relevance at *trial. See, e.g., Felicia v. Celebrity Cruises, Inc.,* 286 F.R.D. 667, 670 (S.D.Fla. 2012) (Snow, L., Magistrate Judge). *Cf. Milinazzo v. State Farm Ins. Co.,* 247 F.R.D. 691, 695 (S.D.Fla.2007) (Torres, E., Magistrate Judge) (defendant opposing discovery "must, therefore, show that the requested discovery has no possible bearing on the claims and defenses in the case"). But there are also courts which hold that the burden of establishing relevance is on the party *seeking* discovery. *See e.g., Hofer v. Mack Trucks, Inc.,* 981 F.2d 377, 380 (8th Cir.1992) ("some threshold showing of relevance must be made before parties are required to open wide the doors of discovery ..."); *Oleg Cassini, Inc. v. Electrolux Home Products, Inc.,* No. 11 Civ 1237, 2013 WL 466198 (S.D.N.Y. Feb. 7, 2013).

■ Because "[c]ourts must employ a *liberal* discovery standard in keeping with the spirit and purpose of the discovery rules, even after the 2000 Amendments to the Rule," *Milinazzo,* 247 F.R.D. at 695–96 (emphasis added), the Undersigned deems it appropriate that Caterpillar demonstrate why the discovery is beyond the broad relevancy standards. *See generally Donahay,* 242 F.R.D. at 687 (noting that "the onus is on the party resisting discovery to demonstrate specifically how the objected-to request is unreasonable or otherwise unduly burdensome" (citations omitted)). *See also Panola Land Buyers Ass'n v. Shuman,* 762 F.2d 1550, 1559 (11th Cir.1985) (quoting, in connection with a motion for a protective order, an out-of-circuit district court case for the proposition that a "party resisting discovery 'must show specifically how ... each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive ...'").

Although CEP's complaint focuses on Caterpillar's representations that the engines could be used continuously for power generation purposes, it is not the *only* theory it advances in its eight counts. For example, it alleges that Caterpillar changed its lubrication oil replacements requirements from every 250 hours to every 150 hours. [ECF No. 1, ¶ 89]. It further alleged that Caterpillar had not properly assembled the gensets in its manufacturing facility before delivery. [ECF No. 1, ¶ 91]. It alleged that the improper assembling included a failure to provide adequate spacing between the radiators and aftercoolers on all 144 gensets and that only 2 of the 144 gensets had the required number of belt pulleys (with 142 having only half of the required number). [ECF No. 1, ¶ 93]. The Complaint includes a claim that the oil lubrication system on the C32 gensets was inadequate as originally manufactured. [ECF No. 1, ¶ 109]. In addition, the Complaint alleged that Caterpillar represented that the gensets needed a top end overhaul at 7,500 hours of operation and a major overhaul at 15,000 hours of operation—but later advised CEP that top end overhauls would be required at 4,200 hours and major overhauls would be required at 7,200 hours.

The Eleventh Circuit has held that discovery about other similar incidents is usually permissible. For example, in *Weeks v. Remington Arms Co., Inc.*, 733 F.2d 1485 (11th Cir.1984), the Court held that the district court impermissibly denied plaintiff's records concerning other incidents of a gun manufacturer's shotgun firing with the safety on, a scenario similar to the accident at issue. The Court noted that the relevancy of similar accident evidence "has been firmly established in this circuit" and explained that the evidence might be relevant to the "defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation." *Id.* at 1492 (*citing Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338–339 (5th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981)). The *Weeks* court further explained that the evidence "might [also] be used to disprove a defendant's alternative theory of causation." *Id.*

Here, evidence about inquiries, complaints, updates, recalls, analyses and tests concerning the very C32 engines at issue in the lawsuit across all application is relevant to Caterpillar's knowledge and notice of the problems allegedly affecting CEP's engines, Caterpillar's ability to correct the problems, whether the engines were fit for running in continuous operation, and the cause of the failures. These facts all relate to the eight causes of action asserted in the Complaint.

This is not a case where a plaintiff seeks information about a completely different product. The discovery concerns the **same** engine, the C32. Moreover, CEP has presented expert witness testimony that the core parts are similar, and perhaps identical, in engines regardless of the application. Notwithstanding the contrary argument that the engine becomes a different engine in different applications even though the core parts remain constant, the information requested is discoverable. *In re Aircrash Disaster Near Roselawn, Ind.*, 172 F.R.D. 295 (N.D.Ill.1997) (rejecting defendant's relevancy arguments and concluding that evidence concerning the design, certification, operation and flight experience of *similar* models of aircraft built by same manufacturer as one whose crash led to the litigation was discoverable); *Josephs v. Harris Corp.*, 677 F.2d 985 (3d Cir.1982) (information from manufacturer about prior accidents involving a printing press which injured plaintiff and as to similar presses was relevant to the issue of duty to warn and existence of defect, and was therefore discoverable in a products liability action); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 642 (D.Kan.2003) (plaintiffs in products liability lawsuit brought against dishwasher manufacturer whose appliance allegedly caused a fire which destroyed their house were permitted discovery about other dishwashers **or component parts** of base model dishwashers).

Assuming, for the sake of discussion, that the same C32 engines undergo some type of modification when used in other applications, based on the addition or removal of parts, they may be a somewhat different product.

Even under this scenario, discovery would still be permissible depending on the facts of the case, as explained in *Fletcher v. Atex, Inc.*, 156 F.R.D. 45, 48 (S.D.N.Y.1994), which involved a discovery request for injuries sustained by other employees using similar, but not identical, computer keyboards:

> Indeed, even for purposes of admissibility at trial, evidence of prior incidents need not fit precisely the pattern of events alleged in the complaint. As observed by Judge Weinstein, "if the accident is offered to prove notice, a lack of exact similarity of conditions will not cause exclusion provided the accident was of a kind which should have served to warn the defendant." 1 J. Weinstein *et ano.*, *Weinstein's Evidence* ¶ 401[10] at 401–67 (1992). *Accord, Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 555 (D.C.Cir.1993) (involving admissibility at trial and finding no error in permitting plaintiffs in product liability lawsuit to introduce into evidence technical data reports analyzing spur adapter gearshaft failures in two unrelated accidents, and noting that gearshafts broke in precisely the same location as the pilot's helicopter at issue in the lawsuit); *Ponder v. Warren Tool Corp.*, 834 F.2d 1553, 1560 (10th Cir.1987). *See also In re Carey*, 929 F.2d 1229, 1235 n. 2 (7th Cir.1991) (citing cases and noting that "substantially similar" does not mean identical).[3]

The Undersigned acknowledges Mink's view that the engine is, for many purposes, a different product when used in applications different than the generation of power. Nevertheless, because the core parts are still identical, the engines would still certainly be deemed **similar** to the 144 at issue here—and that is sufficient to permit the requested discovery. *Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 164 (S.D.N.Y.2011) (in discovery, "different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation" (quotation omitted)); *Desrosiers v. MAG Indust. Automation Sys., LLC*, 675 F.Supp.2d 598, 601–602 (D.Md.2009) (plaintiff alleging products liability, negligence, and breach of warranty was entitled to discovery of prior accidents with salient characteristics).

In fact, there is authority from district courts in this Circuit which would permit discovery of products even only "arguably similar" to the product at issue. *Smith v. Ford Motor Co.*, No. 79–cv–133A, 1981 WL 380687, at *3 (N.D.Ga. April 2, 1981) (noting that "defendant manufacturer must bear the burden of establishing that the other products about which plaintiffs seek information are so substantially dissimilar to the transmission installed on plaintiffs' truck that the information sought is so lacking in germaneness so that it is not conceivably helpful and not reasonably calculated to lead to admissible evidence").

### Conclusion

The requested discovery concerning C32 engines in other applications is relevant for discovery purposes and Caterpillar will need to produce responsive documents by June 12, 2015. It may or not be admissible at trial or for substantive pre-trial purposes.

Therefore, for purposes of musical symmetry, the Undersigned will end this order by analogizing the ruling on CEP's discovery dispute to lyrics from another fishing song: "Fishin' Blues," by blues icon Taj Mahal: "Many fish bites if ya' got good bait, I'm a goin' fishin,' Yes I'm goin' fishin,' and my baby goin' fishin' too."[4] In other words, the Court is allowing CEP to pursue the discovery even though it might involve some fishing—because the fishing is relevant and permissible under the circumstances at issue here. As noted above, the Undersigned will not award fees or costs to CEP.

---

3. The Undersigned provided the additional parenthetical explanations about the cases cited in the excerpt quoted from *Fletcher v. Atex.*

4. From the *Giant Step* album (Columbia 1969).